Alan Jay LERNER and Frederick Loewe, Betty Comden, Adolph Green and Jule Styne, De Sylva, Brown & Henderson, Inc., and Chappell & Co., Inc., Plaintiffs,

v.

Irving SCHECTMAN and Glenn Corporation, Defendants.

No. 4–63–Civ.–303.

United States District Court
D. Minnesota,
Fourth Division.

April 17, 1964.

Loring M. Staples, Faegre & Benson, Minneapolis, Minn., for plaintiffs.

Edward M. Glennon, Lindquist, Magnuson & Glennon, Minneapolis, Minn., for defendants.

DEVITT, Chief Judge.

This is an action for infringement of copyright, 17 U.S.C.A. §§ 1(e), 101(a)(b) in which the plaintiffs seek an injunction and damages for the unauthorized public performance for profit of certain copyrighted musical compositions. The compositions involved are listed in the footnotes.[1]

It is admitted by the defendants that the plaintiffs own valid copyrights to the compositions in question. The evidence is undisputed that these numbers were played by professional musicians at the defendants' club on the dates set out in the complaint, and that the defendants had no license or permission from plaintiffs to permit these compositions to be

1. "I've Grown Accustomed to Her Face," and "I Could Have Danced All Night," of which the copyright owners are Alan Jay Lerner and Frederick Loewe; "Just in Time," of which the copyright owners are Betty Comden, Adolph Green and Jule Styne; "September Song," of which the copyright owner is De Sylva, Brown & Henderson, Inc.; "How High the Moon," and "My Funny Valentine," of which the copyright owner is Chappell & Co., Inc.

played. It is further admitted that the club in which the numbers were performed is operated for profit. The only issue before this Court is whether the compositions were played "publicly for profit."

Defendant Irving Schectman is the President of the defendant Glenn Corporation, which owns and operates a night club called "The Whitehouse" located in a Minneapolis suburb. In conjunction with this business, and located in the basement of the same premises as The Whitehouse, defendants operate a night club called "The Apartment," which is purportedly a "private" club restricted to accepted members and their guests. It was in this club that the alleged infringements occurred. The sole defense to this action is that the performances were not "publicly for profit" because the club was a private or membership club.

It appears that the defendants have a bona fide membership club. Only accepted members and their guests were admitted, with the only exception shown being the admittance of a new and yet unaccepted applicant.

The plaintiff urges that this case should be controlled by Lerner v. Club Wander In, Inc., 174 F.Supp. 731 (D. Mass.1959), followed in M. Witmark & Sons v. Tremont Social and Athletic Club, 188 F.Supp. 787 (D.Mass.1960). These cases involved ostensibly private clubs which were held liable for infringement under the Copyright Act. These cases, however, are distinguishable from the present one. Judge Aldrich in the Lerner case stated specifically at 174 F. Supp. 732 that the Court need not reach the question of whether a performance strictly limited to club members would be public. The Court found that the performances were in fact open to the general public.

In order to constitute a violation under the Copyright Act it is only necessary that the compositions be played "publicly for profit." It is not necessary that the performance be made to the general public in order that the statute be violated. Nor do we read the law to require that the performance be theoretically accessible to the entire general public. "Public" when used as an adjective is defined as "of or pertaining to the people; relating to, belonging to, or affecting, a nation, state, or community at large." Webster's New International Dictionary, p. 2005 (2d ed. 1958). If this definition were to be literally adopted, exclusion of any segment of the population, such as minors from a bar, would theoretically remove the bar from a "public" status, and hence from the purview of the Copyright statute. This, of course, would be an illogical construction.

So we do not find it difficult to construe the Act as applying where there is only a segment of the public involved, such as those people considered together because of some common interest or purpose. There is no clear line to determine whether a particular social club constitutes a private or public facility. The Court is not impressed with the argument that merely because use of a club is restricted to its membership that it thereby becomes non-public. In order to determine the distinction between a "public" and "private" organization in the particular context, it is necessary to examine the circumstances under which it is organized and operated.

ORGANIZATION

The Apartment was opened in September, 1961, and was largely a product of the business imagination of the defendant Schectman. Its purpose was to offer a select membership club to those "qualified" people who were willing to pay the $10.00 fee. As noted, the club is located in the basement of The Whitehouse, which is a "public" night club, i. e., a non-membership establishment, and is admittedly a profit-seeking venture. The Whitehouse and The Apartment are separate in their operation, and there is no interflow of patrons between the clubs. Admittance to The Apartment is by a separate entrance marked "Members Only."

It is admitted that there are no articles of incorporation or of association evidencing that The Apartment is authorized to do business as a separate entity under state law, and it appears that it is wholly owned and operated by the Glenn Corporation. The profit or loss resulting from its operation accrues or is absorbed by this corporation.

The governmental functions of this social club are virtually non-existent in so far as they involve the members. There are no officers of the club. There is a membership committee, which is also referred to as a board of directors, consisting of the defendant Schectman and three or four club members, close friends and professional associates. The members of this committee are appointed by Schectman for an indeterminate period. The committee does not hold regular meetings, but meets infrequently, usually by telephone, to consider new applications and to discuss rules governing the membership. There are no bylaws governing the committee nor are there regular minutes of its meetings. There are no other committees and any social function sponsored by the club is apparently directed by Schectman. The members have never held any type of meeting, business or otherwise, and have no voice in the operation of the club.

MEMBERSHIP

There are currently about 2400 members who hold membership in The Apartment. Annual dues of $10.00 are paid by each member. This group is apparently a cross-section of the population coming from many states. Membership is not limited to any special income group. The defendant attempted to show that memberships were based on certain specific qualifications but these are more apparent than real. That there is no real screening process of new members is evidenced by the methods used in soliciting members, and by the form and scope of the application for membership.

In the initial solicitation of memberships the defendant engaged a service corporation to prepare a list of persons who would be interested in the "elegant luxury" of this new swank membership club. The source for this list of names was not shown. Applications for charter memberships were sent to an undetermined number of people, presumably in the thousands. Subsequently another list was prepared and a second mailing made offering a "last" opportunity to join as a charter member. Apparently everyone in this initial solicitation who returned the application with the ten dollar fee was admitted to membership without further screening by the membership committee. Since the people initially contacted were selected by the service corporation from numerous sources, it does not appear that the qualifications or requirements for membership were too stringently scrutinized.

A company membership is also offered for $50.00 annually. A company membership affords the facilities of The Apartment to all members of a firm, the only limitation being that the firm must assume or guarantee the charges of these firm members. There is apparently no method of screening the employees of companies purchasing this membership.

Another device which was used to solicit membership to the club was by means of gift certificates which could be purchased by present members and given to virtually anyone. The manner in which these certificates were offered made it possible for anyone to become a member of the club without the necessity of prior approval of the membership committee. Or, if in theory the membership committee did pass on the acceptance of gift membership recipients, the task was merely perfunctory as it would be a practical impossibility for the committee to have personal knowledge of the qualifications of all the recipients. Thus, membership in the club for these gift recipients was based essentially on the representation of the donor member.

OPERATION

Defendants claim that The Apartment is not a common key club. The Apartment facilities are restricted to members and those guests whom the members per-

sonally bring. Club hours were from 5:00 PM to 1:00 AM, Monday through Saturday. The club was not open to members at other hours. There were occasional private parties within the club. Individual or company members could rent the entire facilities of the club to the exclusion of other members. The membership card was not transferrable, and the members were cautioned that any attempt to permit someone else to use the card would result in revocation of membership. It was shown that this restriction was enforced. No one was admitted to the club unless he was a member or a guest accompanying a member.

As noted, there were several club rules, set forth in the footnotes,[2] which were drafted by the defendant Schectman, presumably with the assistance of the membership committee. These rules were mailed to all members and were generally enforced.

There were several functions sponsored by the club which were designed to promote business. These functions were social in nature, such as bikini fashion shows, bus service to various sports attractions, and a group trip to Las Vegas.

## CONCLUSIONS

There is no question that the organization of the club was a result of the defendant Schectman's business imagination, and that the primary purpose for engaging in the business was for personal profit. The large membership, lack of integrated or group relationship or organization, together with the type of activities, indicate that this was more of a commercial night club operation rather than a "club" within the common definition,[3] or the Minnesota statutory definition.[4] Of course, the substantive applications of the Copyright Act are not based on a status created by local law. In the federal field Congressional purpose and intentions are controlling. See Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 288, 66 S.Ct. 532, 90 L.Ed. 670 (1947).

The evidence shows that there were no meaningful qualifications for membership, and that virtually any member of the general public who had good appearance and behavior, and presumably a good credit rating, would be admitted to membership upon payment of the application fee. While the defendants argue

2. 1. There will be no cash transactions. Members will be billed monthly. Accounts not paid by the 20th day of the month will be considered delinquent and further privileges not extended until remittance is made.
2. Gentlemen must wear ties and coats.
3. The Membership Committee reserves the right to withdraw privileges from anyone at any time.
4. Club hours will be 5:00 PM until 1:00 AM Monday through Saturday.
5. A charter company membership may include all personnel the company is assuming charges for.
All membership applications must be approved by the Membership Board.

3. The word "club" is defined in Webster's New International Dictionary, p. 509 (2d ed. 1958), as follows: "b. An association of persons for the promotion of some common object, as literature, science, politics, good fellowship, etc., esp. one jointly supported and meeting periodically. Membership is usually conferred by ballot, and carries the privilege of exclusive use of club quarters."

4. § 340.07, M.S.A.
"Subd. 7. The term 'club' means and includes any corporation duly organized under the laws of the state for civic, fraternal, social, or business purposes or for intellectual improvement or for the promotion of sports, which shall have more than 50 members, and which shall, for more than a year, have owned, hired, or leased a building or space in a building of such extent and character as may be suitable and adequate for the reasonable and comfortable accommodation of its members, and whose affairs and management are conducted by a board of directors, executive committee, or other similar body chosen by the members at a meeting held for that purpose, none of whose members, officers, agents, or employees are paid directly or indirectly any compensation by way of profit from the distribution or sale of beverages to the members of the club, or to its guests, beyond the amount of such reasonable salary or wages as may be fixed and voted each year by the directors or other governing body."

that only a "qualified" segment of the public was admitted, there were no specific qualifications, and the screening process was not designed or utilized to enforce whatever minimum qualifications were imposed.

The membership served no function in relation to the organization or operation of the club. The only function which it served was to expend money for the food and liquor served on the premises. In these respects the club is no different from a public night club, which is defined as "a place of entertainment open at night for eating, drinking, etc., often having a floor show." Webster's New World Dictionary, p. 991 (Col. ed. 1960). The divorcement of the membership from the organization and operation of the club militates against its status as a private facility and emphasizes its orientation as a commercial business.

We have no hesitation in concluding that The Apartment was of a "public" character within the concept of the Copyright Statutes, and that the performances were thus "public" within the protective scope of the law.

The defendant also argues that the Copyright Act should be construed in accordance with the development in the tax law, under which a privately owned "private" club operated for profit was found to be exempt from the application of the cabaret tax. United States v. Lambeth, 176 F.2d 810 (9th Cir.1949); Schrader v. O'Malley, 119 F.Supp. 627 (D.Neb.1954); Naylor v. United States, 102 F.Supp. 309 (S.D.Calif.1952). The philosophy underlying these tax decisions is not analogous to the issue joined here under the Copyright Act. And in view of the decision in Club Ramon, Inc. v. United States, 296 F.2d 837 (4th Cir. 1961), cert. denied, 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962), expressly rejecting the Lambeth reasoning, it would appear that these cases do not reflect the recent construction of the tax statutes.

The essential purpose of the Copyright Act is to protect the interests which composers, authors, etc. have in their artistic product, and to encourage the continued production of literary and artistic works for the benefit of the world. Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 36, 59 S.Ct. 397, 83 L. Ed. 470 (1939). The Supreme Court in Mazer v. Stein, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630, reh. denied, 347 U.S. 949, 74 S.Ct. 637, 98 L.Ed. 1096 (1954) stated the purpose of this act in the following language:

> "The economic philosophy behind the clause empowering Congress to grant * * * copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered." 347 U.S. at 219, 74 S.Ct. at 471, 98 L.Ed. 630.

To allow the unlicensed performance of copyrighted compositions in a membership club such as the one involved here, which is apparently representative of an expanding type of night club entertainment, and which virtually encompasses an unlimited segment of the general public, would effectively emasculate the intent and purpose of the Copyright Act.

In the words of the Supreme Court, "Performances not different in kind from those of the defendants could be given that might compete with and even destroy the success of the monopoly that the law intends the plaintiff to have. It is enough to say that there is no need to construe the statute so narrowly." Herbert v. Shanley Co., 242 U.S. 591, 594, 37 S.Ct. 232, 233, 61 L.Ed. 511 (1917).

In accordance with the foregoing reasoning I find that the performance in the defendants' club constituted a public performance within the purview of the Copyright Act, and hence a violation thereof. Plaintiff may prepare appropriate Findings of Fact, Conclusions of Law, and Order for Judgment.