UNITED STATES of America, Appellant,

v.

J. B. ZARZAUR, Appellee.

No. 23619.

United States Court of Appeals Fifth Circuit.

July 31, 1967.

1. Rule 59(b) reads: * * * A motion for a new trial shall be served not later than 10 days after the entry of the judgment. * * *

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Frederick E. Youngham, Lawrence B. Silver, Attys., Dept. of Justice, Washington, D. C., Macon L. Weaver, U. S. Atty., Birmingham, Ala., for appellant.

Walter L. Mims, William M. Acker, Jr., Birmingham, Ala., for appellee.

Before TUTTLE and AINSWORTH, Circuit Judges, and FULTON, District Judge.

FULTON, District Judge:

This is an action by J. B. Zarzaur to recover cabaret taxes alleged to have been erroneously assessed against him for the calendar quarters of 1955 through 1961, pursuant to Section 4231(6) of the Internal Revenue Code of 1954, which section has been since repealed. Zarzaur sought the refund of $18,105.56 given in partial payment of the assessment. The government asserted a counterclaim seeking to recover the sum of $236,255.70, which sum the government claims as the balance due under the assessment, including interest and penalties.

After trial to a jury, a verdict was returned in favor of the government for the first two quarters of 1955 and in favor of Zarzaur for the remaining quarterly periods. The government's motions for a directed verdict and for a judgment notwithstanding the verdict, or for a partial new trial, were denied by the trial court. The government appeals from the denial of these motions and specifically challenges the correctness of the court's charge to the jury.

The facts are not in dispute. Zarzaur started in the restaurant business under the name of Joe's Ranch House in 1948 on land which he owned on Highway 31 near Vestavia Hill, Alabama. In 1953 the State of Alabama condemned the land upon which the restaurant was located in order to widen the highway. Joe's Ranch House was forced to close down temporarily. In October of 1954, on a portion of the land which had not been condemned, Zarzaur built a new restaurant. This restaurant also was called Joe's Ranch House. The new Joe's Ranch House had two separate dining rooms. In both rooms, food and refreshments were served but only in the larger of the two rooms were there facilities for dancing.

The Ranch House Club, Inc., hereinafter referred to as "the club", was incorporated in 1951 under the laws of

Alabama. The Constitution of the club, signed by its 21 members, stated that its purpose was to secure and to maintain "facilities and means for the mutual entertainment, recreation and amusement of the membership." The Constitution provided for the election of the club's officers and directors, an executive committee and a membership committee. Provisions were made for initiation fees and annual dues. Zarzaur played no part in organizing the club and never became a member thereof, although at one time he did become the club's treasurer.

In 1954, when the new Joe's Ranch House was opened, the club was informally activated. Officers were designated and a sufficient number of new members were obtained to meet the requirements for filing an application with the state for a club liquor license. Zarzaur entered into a lease arrangement with the club to operate Joe's Ranch House in its behalf. The lease could be cancelled by either party upon the giving of 30 days' notice. There was no requirement for the payment of rent. Zarzaur was to receive the gross receipts, excluding dues, and was to assume any losses that might result from the operation of Joe's Ranch House. In the beginning only one of the two rooms in Zarzaur's building was covered by the lease. Later, both rooms were included in the lease. In 1957, Zarzaur transferred the title to the realty on which Joe's Ranch House was situated to his wife. The lease agreement with the club continued unchanged.

Although the club's Constitution provided for a membership committee, Zarzaur alone accepted all applications and issued membership cards. An individual seeking membership in the club was usually required to fill out an application form, be recommended by another member, and be of good character and reputation. There was no evidence of any

applicant being turned down. No initiation fee was ever collected.

During the first six months to a year of operation, non-members were admitted to a portion of the premises. Thereafter, the club adherred to a policy of admitting only members and their guests. During the years in question, Joe's Ranch House continued to be listed in the yellow pages of the Birmingham telephone directory.

The members of the club did not participate in the operation of either the club or the premises. No meetings were ever scheduled. The officers and directors were selected informally and had limited, if any voice in the operation of their "private" facility. Zarzaur exercised discretion in the supervision and management of all aspects of the club and the premises. The annual dues of $1, later increased to $2, were collected by Zarzaur, although they belonged to the club. Each year he donated the money to a charity of his own choosing without the specific knowledge or consent of the membership.

The issue presented to the jury was whether Zarzaur operated Joe's Ranch House as a private club or as a public facility, for any or all of the taxable quarters in question. Section 4231(6) of the Internal Revenue Code of 1954 imposed "a tax equivalent to 20 percent of all amounts paid for admission, refreshments, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance." [1]

Zarzaur contended that he managed the establishment as a private membership club to which the public was not admitted, and therefore, did not furnish a public performance for profit within the meaning of the statute. The government claimed that Zarzaur operated Joe's Ranch House during the period in ques-

---

1. "[R]oof garden, cabaret or other similar place" is defined by Section 4232(b) to "include any room in any hotel, restaurant, hall or other public place where music and dancing privileges, or any oth-

er entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food refreshment, or merchandise."

tion as a public facility for his own profit just as he had operated it as a private business in the prior years.

The question this Court must now decide is whether the instructions given by the trial court adequately informed the jury of the applicable law to enable it to return with a proper verdict. The pertinent parts of the original charge follow:

THE COURT: Gentlemen, the court instructs you that a private club restricted to members of that club and their guests, a club where the public is not permitted to walk in and be served, may provide music for dancing and not be subject to the cabaret tax.

Should you find from the evidence the Ranch House Club, Inc. to be a private club operated for the pleasure and enjoyment of its members and guests, the fact, should you so find, that on occasions a non-member gained admittance without the knowledge and consent of the management of the club, such authorized admittance would not in itself change the status of the club from private to public.

Nor would the failure upon the part of the officers and directors of a private club to conform in every respect to all of the provisions of the Constitution and By-Laws of the club, prevent a club from being a private club.

I charge you, gentlemen, that should you find from the evidence that Mr. Zarzaur had an agreement or contract with the club whereby he was entitled to receive all of the profits realized from the sale of food and drinks within the premises occupied by the Ranch House Club, Inc., then this in itself would not preclude the club from being a private membership club.

It is your duty to determine after a fair and impartial consideration of all of the evidence before you in light of the instructions of the court as to the law, whether the Ranch House Club, Inc. was a private membership club, qualified to be exempt from payment of the cabaret tax and whether it was a night club, restaurant or place catering to and opened to the general public.

\* \* \* \* \* \*

The fact that the Ranch House Club, Inc. was operated at a profit, does not in itself alter its status as a club or organization. Profit making is not determinative of the status of a club within the meaning of the tax statute.

The lack of the members proprietary interest in the club property is not determinative. Nor does lack of managerial control and failure to adhere strictly to the club by-laws affect the significant fact, should you so find, that members joined for the common purpose of using the facilities of the club and that to a significant degree, to their use the club was limited. There are many factors that you should consider in determining whether or not Ranch House Club, Inc. was a private club.

Did it have a membership that could be clearly identified?

Was a sincere effort made to restrict the use of the Club facilities to its members?

Was a membership fee charged and collected?

Did the plaintiff keep and maintain a permanent record of the names and addresses of the members?

Were records kept of the amounts paid by the members as dues?

Did the Club have special parties for the enjoyment of the members on special occasions?

Did it have a manager to whom was delegated authority to operate the club, enforce its rules and even make rules and admit new members?

Did the club have meetings?

Now, gentlemen, the existence of a substantial number of the above factors would be an indication that the activities carried on by the plaintiff were, in fact, those of a private club. On the other hand, the lack of a substantial number of these factors

would be an indication that no private club existed. * * *

The trial judge overruled the government's objections to the Court's failure to charge that the amount of the membership dues might properly be considered by the jury and to the Court's failure to list as a factor for consideration the fact, if it was found to exist, that a non-member of the Club determined the Club's membership.

Following a request by the jury for further instructions, the Court gave a supplemental charge. The government made a general objection to this charge buttressed by a long list of specific objections. The parts of the additional charge pertinent to this appeal follow:

THE COURT: Now, I am going to state for you again the requirements of a private club as this Court interprets them to be from decisions rendered by our Appellate Courts, and I am going to do that in the exact words I used yesterday so there will be no misunderstanding about it.

A private club restricted to members of that club and their guests is a club where the public is not permitted to walk in and be served. Now that club may provide music for dancing and it may allow dancing and still be a private club. And should you find from the evidence that the Ranch House Club, Inc. is indeed a private club operated for the pleasure and enjoyment of its members and guests, the fact should you so find that on occasion a non-member gained admittance without the knowledge and consent of the management of the club, such unauthorized admittance would not in itself change the status of the club from private to public.

Now, the failure of officers and directors of a private club to conform in every respect to all of the provisions of the Constitution and By-Laws of the Club would not prevent it from being a private club. My interpretation of the law is they don't have to cross every "T" and dot every "I" in every respect.

Now, should you find from the evidence that Mr. Zarzaur had an agreement or contract with the Ranch House Club, Inc. whereby he was to act as manager and that he was to get all of the profits and at the same time if it lost, he was to bear all of the losses, that in itself would not prevent it from being a private club.

If you will remember, the testimony was very clear when you first go into the restaurant there is an area here and to the left there was a double door which led into the private club, with a sign at that door.

Now, for a while people came in who were not members of the club and were served there in that private section or that open section. That mere fact alone, if you find it to be true and if you believe the evidence that that is what the evidence is, and it is for you to determine and not for me to tell you, that fact alone in itself would not justify a finding that the Ranch House Club, Inc. operated in the space referred to protected by the doors was not indeed a private club.

Now, the fact that the Ranch House Club was operated for profit would have no bearing in this case as to whether or not it was a private club or a club open to the public. Your common sense will tell you any club is operated to make a little profit or break even. If they are not, I don't care how private they are, they won't last very long.

Now, the fact that the members of this club, the general membership did not participate in making the rules, electing officers, and in general, operating the club in itself would not prevent it from being a private club.

The fact that the club itself did not own the property in which it was located would not prevent it from being a private club. The proper thing, in my opinion, to consider in this—and again I am away from my original charge—was this club to a significant degree and largely limited to the use of people who were members? Now, it

doesn't matter if they pay one dollar or one hundred dollars as membership so long as they paid a membership and had some identification and a reasonable attempt was made to see that that was done and that they were identified before they could get into that place.

Now, in considering whether or not this was a private club, you can take into consideration the following factors: Did it have a membership that could be clearly identified? Now, the testimony on that was that on the first of the year notices were sent to the members that their dues were due and when they sent their dues in a card was sent to them and that card would be used in the early part of the club to identify them to get in, and in the latter years they had a card to put in the door and electronic clock worked to open the lock. Was a sincere effort made to restrict the club facilities to its members? Now, that is for you to decide. I cannot tell you. I have no right to tell you. And if I should express an opinion on it, as I told you yesterday, you have an absolute right to completely disregard it. The only thing I can say to you gentlemen is that you must regard my statements to you as to what the law is, was a membership fee charged and collected? There is no doubt about that. A membership fee was charged and you heard many witnesses testify, even the government witness, that they paid it. Did the plaintiff even maintain a permanent record of the names and addresses of the members? Notices were sent to them the first of every year. I don't imagine they did it from memory. Were records kept of the amounts paid by the members as dues? There is testimony in the first years the dues were intermingled with Mr. Zarzaur's personal bank account—and correct me, gentlemen, if I state any fact wrong, because while the jury has a right to disregard it, I don't want to misstate anything if I can help it— that a large part of the dues, if not all of them, and I don't remember this, was contributed to certain charities. Later on a separate bank account was kept, and you have those records in your possession, a separate bank account was opened up, and the club dues were put in that bank account.

Did the club have special parties for the enjoyment of the members on special occasions? Now, gentlemen, the only testimony that you might consider in that connection is Mr. Zarzaur's testimony that on New Year's the club members were assessed, I believe, a dollar or two dollars, to buy favors, horns, noisemakers, et cetera, for the New Year's.

Did it have a manager to whom was delegated authority to operate the club? There is no doubt about that. Mr. Zarzaur was the manager of the club and he operated it.

Did it have a manager to enforce its rules? And that is undisputed.

Was he allowed to make rules and admit new members? And that is undisputed, and that is all right. The fact that that happens and that that authority is delegated to the manager of the club would not in itself standing alone allow a finding that it was not a private club.

Did the club have meetings? The only testimony as to meetings is if they were held, they were informal meetings. There is no record of any regular meetings that were held other than the original meeting of the six or eight gentlemen who reactivated this club. Now, after that the testimony would tend to show what meetings were held were informal meetings. That standing alone would not be fatal to the claim that this was a private club.

I say to you that the existence of a substantial number of the above factors would be an indication that the activities carried on by the plaintiff were, in fact, those carried on by a private club. On the other hand, the lack of a substantial number of those

factors would be an indication that no private club existed. Now, the presence or absence of any one or more, two or three of the above factors would not be controlling. \* \* \*

The only issue is whether Joe's Ranch House was operated as a facility of a private club. We hold that the Court's charge failed to properly instruct the jury on the issue before it and substantially prejudiced the government's position in this case.

■ The trial judge made it clear that the law required a decision in Zarzaur's favor if the jury found that entrance to Joe's Ranch House was restricted to club members *without regard* to the presence or absence of meaningful membership requirements.

The impact this instruction had on the jury is apparent. There was adequate testimony that during the first two quarters in question entrance into Joe's Ranch House was not limited to club members. The jury found in favor of the government for that initial period.

Webster's Third New International Dictionary Unabridged, 1967 ed., defines "club" as follows:

"An association of persons for social and recreational purposes or for the promotion of some common object (as literature, science, political activity) usu. jointly supported and meeting periodically, membership in social clubs usu. being conferred by ballot and carrying the privilege of use of the club property; [or]

"A commercial establishment serving food and liquor and often featuring music, dancing or other entertainment."

Three cases that appear to support, superficially at least, plaintiff's claim, are Schrader v. O'Malley, 119 F.Supp. 627 (D.C.Neb.1954); Naylor v. United States, 102 F.Supp. 309 (D.C.S.D.Calif. 1952); and United States v. Lambeth, 176 F.2d 810 (9 Cir. 1949). A brief analysis of the above cases is essential to an understanding of the position we take today.

In Schrader v. O'Malley, a private club was found to exist even though the manager of the establishment received all revenues derived from use of the facilities of the club, including membership dues.

In Naylor v. United States, the plaintiffs did business under the name of "The Beverly Hills Club." They organized the club and passed on all applications for membership. An initiation fee and monthly dues were collected. The club was operated for the sole financial benefit of its owners. Admission was limited to members of the club and their guests. The District Court ruled that dances held on the premises were not subject to the cabaret tax because they were not "public performances for profit."

Another decision favorable to plaintiff is United States v. Lambeth. The issue presented there was whether plaintiff served the public in the "La Fiesta" Club. The club, originally incorporated under the name "Cozy Club," leased premises from the plaintiff who had the title "Secretary-Treasurer," and acted as manager of the club. She was personally responsible for all expenses and received all profits as "salary" and rent. Admittance cards were necessary to enter the club, but were available to almost anyone who desired to join. The appellate court found that plaintiff was engaged in the business for personal profit but affirmed as not "clearly erroneous" the trial court's finding that plaintiff did not serve the "public" within the definition of the taxing statute.

The Lambeth decision has come in for strong criticism in a more recent and well reasoned opinion of the Court of Appeals for the Fourth Circuit, Club Ramon, Inc. v. United States, 296 F.2d 837 (1961), cert. den. 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962). In *Club Ramon,* the issue submitted to a jury was whether Club Ramon, Inc. was a bona fide club operated in a private place. The jury found for the plaintiff and against the United States. Club Ramon, Inc., a West Virginia corpora-

tion, was a one-man enterprise carried on for profit. Mattee, his wife, and an employee, Cruise, constituted the sole stockholders, officers and directors of the corporation. Although the by-laws provided for the Board of Directors to prescribe membership requirements and issue membership cards, no regulations were passed and Mattee alone selected the members. No meetings of the membership were held, the members had no voice in the selection of other members, no control over the operations of the Club, and no share in the profits. No formal application for membership was required. Membership was granted upon the request of an applicant or upon the recommendation of a member. Other members could be consulted before issuing a membership card but usually no such investigation was needed. The operation of the establishment involved violations of the State's liquor laws.

The Court held that the enterprise was no more private than the ordinary discriminating restaurant and was similar to a night club—"a commercial establishment operating at night to supply food and entertainment to its customers." The court ruled that the restrictions on membership "were no more severe than those imposed by other public places of entertainment from which, for one purpose or another, certain classes of the general public are customarily excluded." The Court criticized the decision in *Lambeth* for ignoring "realities which are apparent to the ordinary mind." The judgment of the District Court based on the jury verdict was reversed with directions to dismiss the complaint.

■ The principles set forth in *Club Ramon, Inc.* are equally applicable in the present case. The fact that an establishment operates as a club does not automatically exclude the possibility that it provides a public performance for profit. A club may be either a public or a private facility, depending upon the use that is made of the facility and the restrictions imposed for admission thereto.

In Lerner v. Schechtman, 228 F.Supp. 354 (D.C.Minn.1964), an action for infringement of a copyright raised the issue of whether certain copyrighted musical compositions played in defendant's club were performed "publicly for profit." Admission to the club, called "The Apartment," was restricted to members and their guests. The Court immediately rejected the argument that "merely because use of a club is restricted to its membership that it thereby becomes non-public." The Court then considered the circumstances under which the club was organized and operated. The club had no officers. The membership committee, called the Board of Directors, consisted of the defendant, the President of the corporation that owned "The Apartment", and three or four club members. Meetings were held irregularly and informally. The membership never held any meetings and had no voice in the operation of the club. Although this case was decided under the Copyright Act, its findings with respect to "private" vs. "public" club are significant. The Court found that there were "no meaningful qualifications for membership, and that virtually any member of the general public who had good appearance and behavior, and presumably a good credit rating, would be admitted to membership upon payment of the application fee." The Court then found that:

"[T]he membership served no function in relation to the organization or operation of the club. The only function which it served was to expend money for the food and liquor served on the premises. In these respects, the club is no different from a public night club, which is defined as 'a place of entertainment open at night for eating, drinking, etc., after having a floor show.' Webster's New World Dictionary, p. 991 (Col. ed. 1960)."

■ If substance and reality are to be favored over form, the rationale of Club *Ramon, Inc.* and *Lerner* should compel acceptance. A restaurant operated nominally as a club but accessible to almost

anyone without specific qualifications does not meet the test of a private club.

We conclude that the able trial judge did not correctly charge the jury upon the elements of a "private" club vis-à-vis a "public" club.

Reversed and remanded for a new trial.