**J. B. ZARZAUR, Plaintiff-Appellee,**

**v.**

**UNITED STATES of America,
Defendant-Appellant.**

**No. 72-3422.**

United States Court of Appeals,
Fifth Circuit.

May 2, 1974.

Rehearing Denied May 28, 1974.

---

448

Scott P. Crampton, Asst. Atty. Gen., Jack Warren, Meyer Rothwacks, James H. Bozarth, Attys., Tax Div., Dept. of Justice, Washington, D. C., Wayman G. Sherrer, U. S. Atty., William D. Mallard, Jr., Asst. U. S. Atty., Birmingham, Ala., for defendant-appellant.

Walter L. Mims, William G. West, Jr., Birmingham, Ala., for plaintiff-appellee.

Before BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

JOHN R. BROWN, Chief Judge:

We are once again confronted with the specter of the moribund cabaret tax after having thought to have laid

it to a legislative and judicial rest.[1] On this our second[2] and perhaps hopefully last encounter with this case, we must decide whether there was sufficient evidence at the second trial to support the jury's implied finding that the establishment operated by the Taxpayer, J. B. Zarzaur, during the tax years in question was a private club instead of a business providing public performance for profit. 26 U.S.C. § 4231(6).[3] Viewing the evidence in a light most favorable to verdict and Taxpayer, Boeing Co. v. Shipman, 5 Cir., 1969, 411 F.2d 365, we are nevertheless compelled to hold that the District Court erred in not granting the government's motion for J.N.O.V. We therefore reverse.

This suit originated as an action by Taxpayer to recover $18,105.56 he had made in partial payment of a $254,361.-26 assessment for the calendar years 1955–1961 under 26 U.S.C. § 4231(6).[4] After a jury verdict in favor of Taxpayer for the last two quarters of 1955 through 1961, the government took its first appeal asserting insufficiency of the evidence and that an erroneous jury charge had been given by the trial judge. This Court reversed the verdict finding the charge to be incorrect and remanded the case for a second trial. See note 2, *supra*. The able trial judge, faithful to our opinion, correctly instructed a second jury and again Taxpayer won the verdict. Undaunted, the government again appeals resting its hopes solely on lack of sufficient evidence to support the verdict.

The facts of this case, although well detailed in our first opinion,[5] warrant further elaboration. Taxpayer started in the restaurant business in 1948 when he opened a small drive-in restaurant known as Joe's Ranch House south of the town of Vestavia Hills, Alabama, a nearby suburb of metropolitan Birmingham. In 1953, the land on which the restaurant was situated was condemned and the restaurant torn down. On that portion of the land which was not condemned, a larger building was erected and opened for business in October of 1954 under the old name of Joe's Ranch House. The new building had two separate dining rooms. Refreshments were served in both rooms but only the larger of the rooms had facilities for dancing. The seating capacity of the larger room ran from between 250 to 300 persons, but an area with a seating capacity of 80 or 90 persons could be screened off by a folding partition from the section of the room where the dance floor was located. The smaller of the rooms had a seating capacity of approximately 90 persons.

---

1. The cabaret tax was repealed by § 301 of the Excise Tax Reduction Act of 1965, P.L. 89–44, 79 Stat. 136 (sec. 701(b)(1)) as of December 31, 1965.

2. United States v. Zarzaur, 5 Cir., 1967, 381 F.2d 981.

3. SEC. 4231: Imposition of Tax. There is hereby imposed:
   (6) *Cabarets.*—A tax equivalent to 20 percent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The tax imposed under this paragraph shall be returned and paid by the person receiving such payments. . . .
   SEC. 4232: Definitions.

   (b) *Roof garden, cabaret or other similar place.*—The term "roof garden, cabaret, or other similar place," as used in this chapter [§§ 4231–4294 of this title], shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. In no case shall such term include any ballroom, dance hall, or other similar place where the serving or selling of food, refreshment, or merchandise is merely incidental, unless such place would be considered, without the application of the preceding sentence, as a "roof garden, cabaret, or other similar place."

4. See note 3, *supra.*

5. See note 2, *supra.*

In 1951, during the time of the original Joe's Ranch House restaurant, patrons of that establishment decided to form a club ostensibly to secure and maintain "facilities and means for the mutual entertainment, recreation and amusement of the membership." A constitution was written and the Club was incorporated under the laws of Alabama under the name of the Ranch House Club, Inc. The constitution provided for the election of officers and directors, an executive committee and a membership committee. Nominal dues were also required. Taxpayer had no part in organizing the Club and was never a formal member, although at one time he was the Club's treasurer. The Club remained generally inactive until 1954.

Sometime in 1954, after the new Joe's Ranch House had been constructed, members of the Ranch House Club decided to activate their dormant organization and got together to informally select Club officers.[6] Taxpayer was present at this meeting but did not participate in the proceedings.

The newly-elected Board of Directors then entered into an agreement [7] with Taxpayer whereby the Club was to continue to use Joe's Ranch House as its place of business and recreation and Taxpayer was to continue to own and operate the Ranch House as long as he retained the building and made certain the patronage was acceptable. Taxpayer was to keep all profits and absorb all losses. In short, the Club had no financial stake in the operation of the facility. This arrangement could be cancelled by either party upon 30 days notice.

Selection of members for the Club was accomplished by various methods during the tax years in question. There was apparently a vague membership body of small dimension between 1951 and 1954. Beginning with the designation of officers, a membership committee was constituted which theoretically handled membership applications and approval. As with many organizations, approval by the committee was not always expeditious nor given at the exact moment when needed. Many persons desiring admittance into Joe's Ranch House would present themselves at the door lacking a membership card. Therefore, at some point in time the Board delegated its membership selection authority and approval to Taxpayer. Taxpayer would then issue membership cards at the door, theoretically relying on recommendations of current members on hand at the time.

The qualifications for membership in the Club were vague. One need only apply, be recommended by a member, and be of "good character." [8] The lack of particularity with which the selection for membership was made is further evidenced by the application form required to be completed by all prospective applicants. The sole information required was the applicant's name, address, date of birth, home telephone number, occupation, business address and signature. Nearly every person that applied for membership was accepted. Only one person, a real "rabble rouser" was ever

---

6. The reason for activating the Club at this time was given by one witness and Vice-President of the Club as keeping out the "riff-raff". Organizing a private club under Alabama law also permitted the establishment to serve liquor by the drink whereas public restaurants could not.

7. It is unclear from the record whether this was an informal, oral agreement or whether it was committed to paper. In any event, no copies were kept by Taxpayer nor produced at trial.

8. In an answer to an interrogatory propounded by the Government, the Taxpayer stated he believed being of "good character" meant among other things being of the white race, although such a qualification was not required by the Club's constitution. As this interrogatory was not introduced into evidence, we need not decide, therefore, whether being of a particular race could constitute a membership restriction meaningful enough to give a club a private status. Cf. Moose Lodge v. Irvis, 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627.

rejected. The sole limit on the size of the membership was the capacity of the facilities, the restaurant being able to accommodate approximately 250 persons at one time.[9]

No initiation fee for new members was ever charged but dues of between $1.00 and $3.00 per year were assessed by the Club.[10] Taxpayer controlled the money collected and annually donated the majority of it to a charity of his choice, later informing the Board of his selection. In 1957, he even reported $1,480.00 of the dues in his own personal income tax return, taking a corresponding $1,500.00 charitable deduction. Prior to 1958, Taxpayer deposited the dues in his own bank account but after that date he opened a checking account in the Club's name where he kept the funds.[11]

The membership and the Board of Directors had little control, and exercised even less, over the management of their Club facilities. Although Taxpayer claimed that the Board met and discussed various items such as the price and quality of the food and the type of music that should be played, there is no evidence Taxpayer exercised anything but unbridled discretion as to the running of the Club with respect to these items. There is no evidence that the Board or any of the members ever required improvements in the food or sanctioned increases in food prices, or any other change in services or charges.

The organization of the Club was of the loosest nature. No meetings were ever held formally after the initial meeting in 1954 during which the Board was elected, and no financial reports were ever issued. No profits were shared among members, and no stock was issued to the membership. The Club owned or rented no property and made no formal rules or regulations. The most that can be said about the active participation of the Club in the Ranch House's affairs is that on occasion the Board would, when together and dining at the Club, compliment Taxpayer on his management of the facilities and agree to any price increase requests.

Until 1955, the front portion of the Club was open to non-members. After that date, the entire restaurant was deemed private and accessible to Club members only. During the years in question, however, Joe's Ranch House continued to be listed in the Birmingham telephone classified directory under the heading "night clubs" thus advertising itself as being ostensibly open to the public at large.

I

*Sufficiency Of The Evidence*

With these facts in mind we must determine if viewed in a light most favorable to the taxpayer they support a jury verdict that Joe's Ranch House was a private club within the meaning of 26 U.S.C. § 4231.[12] Boeing Co. v. Shipman,

---

9. The actual size of the membership during the years in question, however, varied between 2,500 and 3,000 according to one witness.

10. According to one witness, James White, Vice-President of Joe's Ranch House, dues were not charged to raise revenue but because ". . . you have to have dues to belong to a club."

11. At trial Taxpayer stated that to the best of his recollection he was the only person permitted to write checks on the Ranch House Club account. The president of the Club, Mr. Vaiden, testified that after the account was set up he counter-signed the checks written. It is clear, however, that whether Mr. Vaiden counter-signed the

checks or not is of little importance since Taxpayer in most cases used his own discretion without prior consultation with the Board as to the disposition of the majority of the Club's dues.

12. It is not certain whether the jury's finding that Taxpayer was not liable for the tax was because the Club in question was private or because Taxpayer was determined to be a concessionaire. The form of the charge given the jury was as follows:
    ". . . should you find from the evidence that the Ranch House Club, Incorporated was operated continuously as a private club, or if you find from the evidence that Mr. Zarzaur operated as a concessionaire from July of 1955 through and

5 Cir., 1969, 411 F.2d 365, 374. A mere scintilla of evidence is not sufficient to present a jury question. *Id.*

■ To qualify as a private club under 26 U.S.C. § 4231 we stated on first hearing of this case that "a club may be either a public or private facility, depending upon the use that is made of the facility and the restrictions imposed for admission thereto." 381 F.2d at 988. The main factor to be considered is whether the club has any "meaningful membership" requirements that cull out the club members from the public at large. Other factors are to what degree the members control the operations of the club, share in the profits, and have a voice in the selection of other members.

These standards were clearly enunciated in our first opinion in this case in reliance upon the Fourth Circuit's decision in Club Ramon, Inc. v. United States, 1961, 296 F.2d 837, cert. denied, 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed. 784, and Lerner v. Schechtman, D.C.Minn., 1964, 228 F.Supp. 354. Both of these cases held a so-called private club to be a place of public entertainment.[13] In each case the President or so-called Board of Directors of the club acted unilaterally and informally, appointing themselves to their positions with little or no real selection by the membership. The only distinction between these cases and the case at bar is that in the present case the so-called Board of Directors has no real financial interest in the club, whereas in *Club Ramon* and *Lerner*, the owners of the club composed the Board, a factor which is in our opinion a distinction without a difference.

A more recent case considered by our Court between the first and second appeals of the present case is as pertinent. Chickasaw Club v. United States, 5 Cir., 1972, 466 F.2d 1354. The Chickasaw Club was originally incorporated as a non-profit, non-stock operation conducted nominally as a "private club" in order to circumvent Georgia law prohibiting the sale of liquor by the drink in "public" places. In 1963, several investors desiring to obtain control over the Club's private charter purchased the Club's assets at minimal cost. They then met and appointed themselves as permanent Club officers. Other Club members, if any existed at the time, were not present nor consulted as to the selection. No further meetings were ever held.

Membership under the investors' control was originally solicited by holding an open house with invitations to the general public to attend. After obtaining the figure of 600 members, prospective members were thereafter admitted on a regular basis on approval by the Club's president. There were no specific qualifications for membership—and few if any persons were denied admittance. To become a member, one could either be referred by an investor, referred by a current member, or by filling out a membership application. There was no limit on the maximum number of members.

The Club never met as a general body, never received a financial report, never established any rules or regulations, and never approved the Club's by-laws. All profits and losses were sustained by the individual investors, and claimed on their individual income tax returns. In sum, the Club was nothing more than a public place of entertainment catering to the public at large. This Court, in re-

---

including 1961, you would then bring in a verdict which reads as follows: We, the jury, find for the Plaintiff, J. B. Zarzaur, and against the Defendant, The United States of America."

For our purposes we assume both issues were decided in favor of Taxpayer.

13. At issue in *Club Ramon* was whether in terms of 26 U.S.C.A. § 4231(6)—the same

statute that is involved in the present appeal —the owner of the club was providing a public performance for profit. At issue in *Lerner*, however, was whether the defendant had permitted certain copyrighted musical compositions to be publicly performed for profit in violation of 17 U.S.C.A. §§ 1(e) and 101(a), (b). In both cases the same standards for determining public vs. private clubs were found to apply.

viewing in detail the particular facts of the case, held that [i] there were no meaningful restrictions on membership "more than those imposed by respectable places of entertainment or restaurants," [ii] there were no meaningful privileges of membership, [iii] and members had no control over the operation of the Club.[14]

The three findings by this court in *Chickasaw* apply equally well to the present situation. Being of "good character" in the sense of not being a "rabble rouser" is certainly not an any more stringent restriction than is imposed by respectable public places of entertainment or restaurants. Lack of meaningful membership requirements is further evidenced in this case by Taxpayer being delegated the duty to issue membership cards at the door of his restaurant at his own discretion.

There were also no meaningful privileges of membership that accorded members any different status other than enjoyed by patrons of any restaurant or night club. Members were only allowed to enter the restaurant, purchase food and drink, listen to music, and dance— the same privileges they had before the club was formed. Nor did the members exercise any control over the management of the Club. They were never consulted as to any managerial decisions that Taxpayer made.

The most that can be said for the amount of control exercised by the Board is that they would on occasion meet and informally discuss the quality of the food being served and whether or not prices should be raised. No formal approval procedure was ever established and there is no evidence that the Board did anything but agree to what Taxpayer was doing. Taxpayer arranged for

the liquor license, Taxpayer collected and disbursed the funds collected as dues, and Taxpayer had sole control over his restaurant. In sum, it defies economic reality that the Club would get the exclusive use of the premises free of rent or other charges for upkeep and maintenance and, on the other hand, have absolutely no participation in the gains or profits from its operation. There is therefore no evidence of any substantive value to support a jury verdict that the Club in question was private.

## II

### *The Law Of The Case Doctrine*

Although not confronted with the issue by either Taxpayer or the government, we feel compelled to discuss one procedural point which, if decided adversely to the government, would preclude us from even considering this second appeal. On both appeals of this case we were asked to reverse Taxpayer's verdict on the basis of insufficiency of the evidence. On the first occasion, a panel of our Court made no ruling on the issue instead reversing the case because of an erroneous jury charge. This time we are squarely confronted with the matter, sufficiency of the evidence being the only substantial point of error raised by the government.

■■ This Circuit in following the Law of the Case Doctrine has held that we will not reconsider sufficiency of the evidence at a second appeal if the evidence passed muster the first time around. Lincoln National Ins. Co. v. Roosth, 5 Cir., 1962, 306 F.2d 110. It is a principle not to be taken lightly for to do so would not only encourage judicial inefficiency but also "panel shopping" at the circuit level.[15] We are not, however,

---

14. Of course the investors were in a sense "members" of the Club and essentially controlled the Club's operation. They controlled the Club, however, in their capacity as investors not as members as illustrated by the fact that they themselves treated the profits and losses as their own personal gain or loss.

15. "In more tranquil days and times, an appeal from a second trial would be heard by the same Court as the first appeal. Now, that is highly unlikely, and where it occurs, it is—at least in this Court— due entirely to the laws of chance. That puts a premium on multiple appeals. That is so because, without implying any im-

confronted with this laudable and self-imposed restriction since the Court on the first appeal did not decide this issue and there was no explicit indication as to whether or not there was sufficient evidence to support Taxpayer's verdict. The only issue discussed in the opinion was whether or not the trial courts charge was incorrect. It could of course be argued that in order to even reach the question of an erroneous jury charge there has to exist enough factual evidence to submit to a second jury. But the Court was not necessarily so restricted by its evident determination that the interests of justice presumably called for a new trial, 28 U.S.C.A. § 2106, and we ought not to foreclose inquiry into the sufficiency of the evidence on this appeal on nothing more than a possible supposition that it was —although silently—ruled on before.

### III

*Is Taxpayer, As A Concessionaire,
Liable For The Tax?*

As a final argument, Taxpayer suggests that should the Club be determined

of a private nature and its profits thereby taxable, he, as a concessionaire, should not be held liable for the tax. This is a novel argument which Taxpayer can put forward because of the 1958 amendment to § 4231(6) which, in effect, required a concessionaire of a private club to pay an amount equal to the tax to the proprietor who in turn paid the government. Prior to this amendment the person receiving payments for "admission, refreshments, service, or merchandise" was solely responsible for the tax.

■ Even assuming the jury determined Taxpayer to be a concessionaire in terms of § 4231(6),[16] this status would not serve to permit Taxpayer to avoid the tax. The person actually receiving the payments was liable for the tax before the amendment as well as after, regardless of his status. Congress in explaining the purpose of the amendment has made this matter very plain.[17] Here, Taxpayer was the one person receiving the payments from his public patrons. If he were a concessionaire, he had to pay the tax over to himself as op-

proper purpose to litigants or their counsel, or acknowledging anything more than, as human beings, Judges will unavoidably have differences in emphasis, approach, or views on close questions in given areas, if the practice is followed for each succeeding panel to arrive at its own decisions, the losing party on the first appeal will naturally strive to bring it back a second, or a third, or a fourth time until all are exhausted. This possibility involves something other than simply more grist for our mill and as to which we should be indifferent. One of the vices is that whether a litigant gets a second, or a third time at bat likewise depends so much on chance, or at least on factors making it most unfair that in one situation a second trial and appeal is available while in another one it is lacking. A variety of possibilities will illustrate these unpredictables: the trial Court enters judgment for a plaintiff on a jury verdict, and we reverse for failure to grant an instructed verdict, but send it back for a new trial because no proper motion for *j. n. o. v.* has been made, see Yorkshire Indemnity Co. v. Roosth & Genecov Production Co., 5 Cir., 1958, 252 F.2d 650, 657–658. An-

other trial Judge, in substantially the same kind of case, takes a bolder course, grants the motion for directed verdict and enters judgment for a defendant which on appeal we affirm. In the former situation, the parties will have a second chance and a second appeal. In the latter, it will be a one-shot affair. Countless other variations may readily be envisoned."
306 F.2d at 114.

16. See note 12, *supra*.

17. (c) Collection of Cabaret Tax on Payments to Concessionaires
     ". . . . Since liability for tax is on the person receiving the designated payments, more than one person may be liable for tax and the filing of returns for a single establishment. This arises because it is common practice for a cabaret proprietor to sell or lease certain portions of his business as a concession. . . .
     "To provide a more uniform and adequate system of reporting for individual cabarets, the bill, as passed by the House and agreed to by your committee, provides that all of the tax for 1 establishment is to be returned by 1 person. . . .

erator of the establishment, and in that status he had to pay the tax to the government.

Reversed and remanded with directions for the trial court to enter judgment for the government.

"Although the proprietor will not be personally liable for the tax, he will be responsible for the collection and return of the tax in the same manner as a person receiving taxable payments is responsible for collection and return of other collectible taxes. The concessionaire will remain responsible for the tax until paid to the Government."

Senate Report No. 2090, 85th Cong., 2d Sess., pp. 37–42, 1958 U.S.Code Cong. & Admin.News pp. 4395, 4432–4433.

