220 Pa. Superior Ct. 356 (1971)
Commonwealth, Human Relations Commission, Appellant,
v.
Loyal Order of Moose, Lodge No. 107.
Superior Court of Pennsylvania.
Argued March 8, 1971.
December 13, 1971.
Before WRIGHT, P.J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.
Stanton W. Kratzok, Assistant Attorney General, for Commonwealth, Human Relations Commission, appellant.
Thomas D. Caldwell, Jr., with him Caldwell, Clouser & Kearns, for appellee.
OPINION PER CURIAM, December 13, 1971:
Order affirmed, on the opinion of Judge LIPSITT.
*357 DISSENTING OPINION BY SPAULDING, J.:
I respectfully dissent.
Appellant, the Pennsylvania Human Relations Commission, appeals from an order of the Court of Common Pleas of Dauphin County, reversing a previous order entered by the Commission against appellee, Loyal Order of Moose, Lodge No. 107.
The relevant facts are not in dispute and are drawn from the pleadings and stipulations of the parties. The Human Relations Commission is a state administrative commission charged by statute to prohibit discrimination because of race, color, religion or national origin in the fields of employment opportunity, housing, education and public accommodation.[1] Appellee Moose Lodge No. 107 is one of the many subordinate lodges of the Supreme Lodge of the World, Loyal Order of the Moose. Under its Charter from the Supreme Lodge, the Local is bound by the Constitution and general rules and regulations of the national body.[2] Lodge No. 107 *358 is a nonprofit, fraternal corporation and operates facilities for the entertainment of its members, in a building it owns in Harrisburg. Included in these facilities are a dining room and a bar which, although normally used by members and their guests, are at times rented to various nonmember individuals and organizations.
Membership in Moose Lodge No. 107 is governed by the Constitution of the Supreme Lodge which provides inter alia that: "The membership of the lodges shall be composed of male persons of the Caucasian or White race above the age of twenty-one years, and not married to someone of any other than the Caucasian or White race, who are of good moral character, physically and mentally normal, who shall profess a belief in a Supreme Being."[3] Appellee maintains the policy of permitting only Caucasian males as members. Although Section 92.2 of the Supreme Lodge Constitution permits members to invite nonmembers  without any qualifications or restrictions  to social activities maintained by a lodge, the Local permits its members to bring only Caucasian guests onto its premises. In December 1968, Harry A. Englehart, Jr., a member in good standing, brought four guests into the dining room: K. LeRoy Irvis, Majority Leader of the State House of Representatives, Herbert A. Fineman, Speaker of the House, James F. Prendergast, a member of the House, and Vincent Scarelli, the Chief Clerk of the House. Mr. Irvis is black. The entire party was refused service. Racial discrimination is undisputed; the lodge refusing service solely because of Irvis' race.
*359 Representative Irvis filed a complaint with the Human Relations Commission alleging that the Moose had unlawfully refused him service. After being unsuccessful in its attempt to reach an amicable settlement, hearings were held by the Commission. Subsequently an opinion was filed holding that the Moose Lodge dining room was in fact a "place of public accommodation" as defined by the Pennsylvania Human Relations Act of October 27, 1955, P.L. 744, as amended by the Act of February 28, 1961, P.L. 47, 43 P.S. 951 et seq., and that appellee was guilty of unlawfully discriminating against complainant Irvis. The Commission issued a "cease and desist order" on March 6, 1968. The order was appealed by the Moose to the Court of Common Pleas of Dauphin County and in March 1970, the court held that although the incident was "morally indefensible" and that "the conduct of the representatives or agents of the appellant was deficient in good manners and common sense . . . the redress does not fall within the public accommodation section of the Act." This appeal followed.[4]
There is, of course, no easy solution to the problem of acknowledging certain interests in exclusive associations without at the same time undercutting the principle of the rule that there shall be no discrimination in places of public accommodation. Appellee's refusal to admit complainant Irvis was, in fact, a violation of the Human Relations Act, supra. Section 5 of the Act reads, in part, as follows:
*360 "It shall be an unlawful discriminatory practice,. . . in the case of a fraternal corporation or association, unless based upon membership in such association or corporation . . .
(i) for any person being the owner, lessee, proprietor, manager . . . of any place of public accommodation. . . to
(1) refuse, withhold from, or deny to any person because of his race, color . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation." By its practice of opening its dining room to nonmembers, subject only to the limitations that they be of the Caucasian race and invited by a member, appellee has brought itself within the ambit of a "public accommodation" as defined by § 4(1) of the Act, and within the prohibition of § 5, at least as to its dining facilities.
The Legislature has indicated that for purposes of the Act, a "place of public accommodation" is "any place which is open to, accepts or solicits the patronage of the general public . . . but shall not include any accommodations which are in their nature distinctly private." (§ 4(1)) Appellee concedes that any member of the general public is welcome at the Moose dining room so long as he comes at the invitation of a member and is of the Caucasian race. The interests of privacy and exclusiveness of association which the Act acknowledged by creating its exclusion for fraternal organizations have been compromised by the policies of the organization itself. Any member of the public, regardless of affection or disaffection for the appellee and regardless of eligibility for membership (as in the case of women and children) may intrude upon the privacy and exclusiveness of the Moose dining room, so long as there is some member of the Moose who will *361 stand accountable for his conduct while on the premises. . . that is, any Caucasian member of the public.
Certainly, there are benefits in the appellee's acceptance of nonmembers into its dining room: the attractiveness of membership in the Lodge is enhanced if members may take their friends and business associates to a place where they are recognized and acknowledged. However, the appellee may not pursue this benefit by opening its doors to the public, while at the same time arbitrarily excluding certain members of the public by exercising its privilege as a private club.
I disagree with the lower court's interpretation of the Legislature's intent in amending § 5 to create an area of immunity where a fraternal organization discriminates on the basis of membership. The lower court concluded that the only discernible legislative intent was to provide fraternals with a shield against attacks on their membership policies. Although I would agree that the obvious intention was to make fraternals immune where their actions are based on membership, I further conclude that this amendment must be read in the light of the "distinctly private" language of § 4. Thus, as I understand this legislation, fraternals are immune from the requirement of § 5 when the accommodation or activity is related to membership in the organization, and when that activity or accommodation is distinctly private as to the members of that organization. There is absolutely no indication that the Legislature intended to grant fraternals a second distinct exception and one going beyond "membership". Had the Legislature intended to sanction discrimination in the admission of members' guests, it could easily have so provided. For example, the Massachusetts Public Accommodation Act specifically extends the exclusive community to "members and their guests."[5]
*362 It cannot be seriously disputed that when appellee rents its facilities to nonmember groups and individuals  apparently a common practice  the premises become a place of "public accommodation" within the scope of the Act. In these situations, appellee follows the required nondiscriminatory policy in determining the allocation of its facilities. There is no significant distinction between that use and the instant situation. In each case, appellee has opened its facilities to members of the general public, thus destroying any "distinctly private" atmosphere that the facilities might have had. The situations differ only in the degree to which appellee has retreated from the area of immunity.
There is no question that under the Act of the Legislature appellee may discriminate in whatever manner it pleases in determining its qualifications for membership. But under its present policies, appellee has ventured beyond its rights to the point at which it must bow to the State's interest in assuring equality of access to all its citizens.
The Court below erred in not referring to the Statutory Construction Act of May 28, 1937, P.L. 1019, § 52, 46 P.S. 552 in its attempt to interpret the Human Relations Act, supra. The Statutory Construction Act states, in part: "That the Legislature intends to favor the public interest as against any private interest." To construe the legislative intent as sanctioning discrimination in the admission of guests would hardly favor any public interest as defined and set out in the "Introduction to the Human Relations Act". Rather, it would enlarge the area of lawful discrimination. The Legislature did not use the words "members and their guests" and for this Court to supply them is contrary to a sound interpretation of the Human Relations Act and the specific mandate of the Statutory Construction Act.
I would reverse the order of the court below.
HOFFMAN and CERCONE, JJ., join in this dissenting opinion.
NOTES
[1] Act of October 27, 1955, P.L. 744 as amended by the Act of February 28, 1961, P.L. 47, 43 P.S. 956-957.
[2] The objects and purposes of Lodge No. 107 are set forth in the Constitution of the Supreme Lodge as follows: "The objects and purposes of said fraternal and charitable lodges, chapters, and other units are to unite in the bonds of fraternity, benevolence, and charity all acceptable white persons of good character; to educate and improve their members, socially, morally, and intellectually; to assist their members and their families in time of need; to aid and assist the aged members of the said lodges, and their wives; to encourage and educate their members in patriotism and obedience to the laws of the country in which such lodges or other units exist, and to encourage tolerance of every kind; to render particular service to orphaned or dependent children by the operation of one or more vocational, educational institutions of the type and character of the institution called `Mooseheart', and located at Mooseheart, in the State of Illinois; to serve aged members and their wives in a special and unusual way at one or more institutions of the character and type of the place called `Moosehaven', located at Orange Park, in the State of Florida; to create and maintain foundations, endowment funds, or trust funds, for the purpose of aiding and assisting in carrying on the charitable and philanthropic enterprises heretofore mentioned; provided, however, that the corporation may act as trustee in the administration of such trust funds, with authority to use the interest therefrom and, in case of emergency, the principal as well, for the perpetuation of Mooseheart and Moosehaven or either of them."
[3] Section 71-1.
[4] In the meanwhile Irvis had brought an action in the United States District Court for the Middle District of Pennsylvania. A three-judge Constitutional Court, per the late Judge FREEDMAN, held that the issuance of a liquor license to the Lodge by the Pennsylvania Liquor Control Board violated the Equal Protection Clause of the Fourteenth Amendment, because of the Lodge's policy of discriminating against blacks. 318 F. Supp. 1246 (M.D. Pa. 1970).
[5] Mass. Public Accommodation Law (Mass. Gen. Laws Ann. Ch. 272, § 92A (1959)).