## MOOSE LODGE NO. 107 *v.* IRVIS ET AL.

No. 70–75.  Argued February 28, 1972—Decided June 12, 1972

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 179. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 184.

*Frederick Bernays Wiener* argued the cause for appellant. With him on the briefs were *Clarence J. Ruddy, Robert E. Woodside,* and *Thomas D. Caldwell, Jr.*

*Harry J. Rubin* argued the cause for appellees and filed briefs for appellee Irvis. *J. Shane Creamer,* Attorney General of Pennsylvania, and *Peter W. Brown* and *Salvatore J. Cucinotta,* Deputy Attorneys General, filed a brief for appellees Scott et al.

*Robert A. Yothers* filed a brief for the Benevolent and Protective Order of Elks of the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *John T. Rigby* for the Lawyers' Committee for Civil Rights Under Law, and by *Samuel Rabinove, Paul S. Berger, Joseph B. Robison, Arnold Forster, Paul Hartman,* and *Joseph Z. Fleming* for the American Jewish Committee et al.

*William H. Botzer* and *Jack P. Janetatos* filed a brief for the Washington State Federation of Fraternal, Patriotic, City and Country Clubs as *amicus curiae.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Appellee Irvis, a Negro (hereafter appellee), was refused service by appellant Moose Lodge, a local branch of the national fraternal organization located in Harrisburg,

Pennsylvania. Appellee then brought this action under 42 U. S. C. § 1983 for injunctive relief in the United States District Court for the Middle District of Pennsylvania. He claimed that because the Pennsylvania liquor board had issued appellant Moose Lodge a private club license that authorized the sale of alcoholic beverages on its premises, the refusal of service to him was "state action" for the purposes of the Equal Protection Clause of the Fourteenth Amendment. He named both Moose Lodge and the Pennsylvania Liquor Authority as defendants, seeking injunctive relief that would have required the defendant liquor board to revoke Moose Lodge's license so long as it continued its discriminatory practices. Appellee sought no damages.

A three-judge district court, convened at appellee's request, upheld his contention on the merits, and entered a decree declaring invalid the liquor license issued to Moose Lodge "as long as it follows a policy of racial discrimination in its membership or operating policies or practices." Moose Lodge alone appealed from the decree, and we postponed decision as to jurisdiction until the hearing on the merits, 401 U. S. 992. Appellant urges, in the alternative, that we either vacate the judgment below because there is not presently a case or controversy between the parties, or that we reverse on the merits.

I

The District Court in its opinion found that "a Caucasian member in good standing brought plaintiff, a Negro, to the Lodge's dining room and bar as his guest and requested service of food and beverages. The Lodge through its employees refused service to plaintiff solely because he is a Negro." 318 F. Supp. 1246, 1247. It is undisputed that each local Moose Lodge is bound by the constitution and general bylaws of

the Supreme Lodge, the latter of which contain a provision limiting membership in the lodges to white male Caucasians. The District Court in this connection found that "[t]he lodges accordingly maintain a policy and practice of restricting membership to the Caucasian race and permitting members to bring only Caucasian guests on lodge premises, particularly to the dining room and bar." *Ibid.*

The District Court ruled in favor of appellee on his Fourteenth Amendment claim, and entered the previously described decree. Following its loss on the merits in the District Court, Moose Lodge moved to modify the final decree by limiting its effect to discriminatory policies with respect to the service of guests. Appellee opposed the proposed modification, and the court denied the motion.

The District Court did not find, and it could not have found on this record, that appellee had sought membership in Moose Lodge and been denied it. Appellant contends that because of this fact, appellee had no standing to litigate the constitutional issue respecting Moose Lodge's membership requirements, and that therefore the decree of the court below erred insofar as it decided that issue.

Any injury to appellee from the conduct of Moose Lodge stemmed, not from the lodge's membership requirements, but from its policies with respect to the serving of guests of members. Appellee has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others. *Virginian R. Co. v. System Federation,* 300 U. S. 515, 558 (1937); *Erie R. Co. v. Williams,* 233 U. S. 685, 697 (1914). While this Court has held that in exceptional situations a concededly injured party may rely on the constitutional rights of a third party in obtaining relief, *Barrows* v.

*Jackson,* 346 U. S. 249 (1953),[1] in this case appellee was not injured by Moose Lodge's membership policy since he never sought to become a member.

Appellee relies on *Flast* v. *Cohen,* 392 U. S. 83 (1968), and *Law Students Research Council* v. *Wadmond,* 401 U. S. 154 (1971), to support the breadth of the District Court's decree. *Flast* v. *Cohen* held that a federal tax-payer had standing *qua* taxpayer to challenge the expenditure of federal funds authorized by Congress under the taxing and spending clause of the Constitution. The Court in *Flast* pointed out:

> "It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This require-ment is consistent with the limitation imposed upon state-taxpayer standing in federal courts in *Doremus* v. *Board of Education,* 342 U. S. 429 (1952)." 392 U. S., at 102.

The taxpayer's claim in *Flast,* of course, was that the proposed expenditure violated the Establishment Clause of the First Amendment to the Constitution, a clause which by its terms prohibits taxing and spending in aid of religion.

The Court in *Law Students Research Council* v. *Wadmond, supra,* noted that while appellants admitted that no person involved in that litigation had been refused admission to the New York bar, they claimed that the existence of New York's system of screening applicants for admission to the bar worked a chilling effect upon the free exercise of the rights of speech and association of students who must anticipate having to meet its

---

[1] Our recent opinion in *Sierra Club* v. *Morton,* 405 U. S. 727, re-ferred to a similar relationship between the standing of the plaintiff and the argument of which he might avail himself where judicial review of agency action is sought. *Id.,* at 737.

requirements. The Court then went on to decide the merits of the students' contention. While the doctrine of "overbreadth" has been held by this Court in prior decisions to accord standing by reason of the "chilling effect" that a particular law might have upon the exercise of the First Amendment rights, that doctrine has not been applied to constitutional litigation in areas other than those relating to the First Amendment.

We believe that Moose Lodge is correct, therefore, in contending that the District Court in its decree went beyond the vindication of any claim that appellee had standing to litigate. Appellee did, however, have standing to litigate the constitutional validity of Moose Lodge's policies relating to the service of guests of members. The language of the decree, insofar as it referred to Moose Lodge's "policy of racial discrimination in its membership or operating policies or practices" is sufficiently broad to encompass practices relating to the service of guests of members, as well as policies and practices relating to the acceptance of members. But Moose Lodge claims that, because of the position appellee took on the motion to modify the decree, he in effect disclaimed any interest in obtaining relief based solely on the Lodge's practice with respect to serving the guests of members.

Appellee in his brief on this point says:

> "[Moose Lodge's argument as to mootness] is based upon Moose Lodge's motion to modify the decree . . . and somehow to allow it to change its operations and to permit Irvis to be brought to the Moose Lodge's premises as a guest. But, as Irvis pointed out in his answer to this motion . . . nothing at all would be changed even if this were done because the vice of racial discrimination arose from the privileges of membership, either those accruing to a person in his own enjoyment of them or those

accruing to a person in his ability to bring a guest or guests to Moose Lodge. Nothing in the suggested modification would make repetition impossible because the fact that Irvis was a guest was purely happenstance. Whether he be barred because no member would invite him or because he has no opportunity to become a member, the situation remains unchanged." (Brief for Appellee 41.)

During oral argument of the case here, counsel for appellee was asked to explain why he opposed the motion to modify made in the lower court, and he responded as follows:

"The motion to modify which would have allowed Mr. Irvis or any others to be admitted as a guest would have done nothing to remove the Commonwealth of Pennsylvania from the discriminatory actions of the Moose Lodge.

"That is, it still would have been a matter of being dependent upon a white member of the Moose Lodge to invite him there. It would have been a matter of no particular Negro being sure that the Moose Lodge would or would not discriminate. The Commonweath of Pennsylvania would still be issuing that license to a discriminating private club. And I think it's worth noting that at the time this motion to modify was being presented, the Moose Lodge was in the process of amending its by-laws to forbid Negroes from being guests. So, at the same time they were saying let us modify the decree so that we can admit Mr. Irvis as a guest, their by-laws were being amended to say no Negroes can come in as guests, let alone members.

"We feel that the idea that he should then be allowed to come in as a guest through a modification of the decree does not go to the heart of the

problem. It does not supply the type of redress that we think cuts through the problem of state participation or support for the discrimination of the Moose Lodge, and that is why we oppose it." Tr. of Oral Arg. 31–32.

We are loath to attach conclusive weight to the relatively spontaneous responses of counsel to equally spontaneous questioning from the Court during oral argument. However, upon examination of this answer it reflects substantially the same position as appellee took in his brief here. While it is possible to infer from these statements that appellee is simply not interested in obtaining any relief as to guest practices of Moose Lodge if he should prevail on the merits, it is equally possible to read them as being tactical arguments designed to avoid having to settle for half a loaf when he might obtain the whole loaf.

The mere refusal by appellee to consent to the proposed amendment of the judgment by itself could not be construed as a waiver or disclaimer of injunctive relief directed solely to Moose Lodge's practice with respect to the service of guests. Appellee's complaint, while directed primarily at membership policies of Moose Lodge, contained a customary prayer for other relief which was broad enough to embrace relief with respect to the practices of the lodge in serving guests of members. The District Court in its decree used language that was clearly broad enough to include such practices, as well as the membership policies of Moose Lodge. Having thus prayed for such relief in his complaint, and having obtained it from the District Court, nothing less than an explicit renunciation of any claim or desire for such relief here would justify our concluding that there was no longer a case or controversy with respect to Moose Lodge's practices in serving guests of members. We do not believe that a fair reading of appellee's

argument in opposition to the motion to amend the judgment below, or of the statements made in his brief and oral argument here, amount to such an explicit renunciation.

Because appellee had no standing to litigate a constitutional claim arising out of Moose Lodge's membership practices, the District Court erred in reaching that issue on the merits. But it did not err in reaching the constitutional claim of appellee that Moose Lodge's guest-service practices under these circumstances violated the Fourteenth Amendment. Nothing in the positions taken by the parties since the entry of the District Court decree has mooted that claim, and we therefore turn to its disposition.

## II

Moose Lodge is a private club in the ordinary meaning of that term. It is a local chapter of a national fraternal organization having well-defined requirements for membership. It conducts all of its activities in a building that is owned by it. It is not publicly funded. Only members and guests are permitted in any lodge of the order; one may become a guest only by invitation of a member or upon invitation of the house committee.

Appellee, while conceding the right of private clubs to choose members upon a discriminatory basis, asserts that the licensing of Moose Lodge to serve liquor by the Pennsylvania Liquor Control Board amounts to such state involvement with the club's activities as to make its discriminatory practices forbidden by the Equal Protection Clause of the Fourteenth Amendment. The relief sought and obtained by appellee in the District Court was an injunction forbidding the licensing by the liquor authority of Moose Lodge until it ceased its discriminatory practices. We conclude that Moose Lodge's refusal to serve food and beverages to a guest

by reason of the fact that he was a Negro does not, under the circumstances here presented, violate the Fourteenth Amendment.

In 1883, this Court in *The Civil Rights Cases,* 109 U. S. 3, set forth the essential dichotomy between discriminatory action by the State, which is prohibited by the Equal Protection Clause, and private conduct, "however discriminatory or wrongful," against which that clause "erects no shield," *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948). That dichotomy has been subsequently reaffirmed in *Shelley* v. *Kraemer, supra,* and in *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961).

While the principle is easily stated, the question of whether particular discriminatory conduct is private, on the one hand, or amounts to "state action," on the other hand, frequently admits of no easy answer. "Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." *Burton* v. *Wilmington Parking Authority, supra,* at 722.

Our cases make clear that the impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination. *Shelley* v. *Kraemer, supra.* The Court held in *Burton* v. *Wilmington Parking Authority, supra,* that a private restaurant owner who refused service because of a customer's race violated the Fourteenth Amendment, where the restaurant was located in a building owned by a state-created parking authority and leased from the authority. The Court, after a comprehensive review of the relationship between the lessee and the parking authority concluded that the latter had "so far insinuated itself into a position of interdependence with Eagle [the restaurant owner] that it must be recognized as a joint participant in the challenged

activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U. S., at 725.

The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in *The Civil Rights Cases, supra,* and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," *Reitman* v. *Mulkey,* 387 U. S. 369, 380 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition.

Our prior decisions dealing with discriminatory refusal of service in public eating places are significantly different factually from the case now before us. *Peterson* v. *City of Greenville,* 373 U. S. 244 (1963), dealt with the trespass prosecution of persons who "sat in" at a restaurant to protest its refusal of service to Negroes. There the Court held that although the ostensible initiative for the trespass prosecution came from the proprietor, the existence of a local ordinance requiring segregation of races in such places was tantamount to the State having "commanded a particular result," 373 U. S., at 248. With one exception, which is discussed *infra,* at 178–179, there is no suggestion in this record that the Pennsylvania statutes and regulations governing the sale of liquor are intended either overtly or covertly to encourage discrimination.

In *Burton, supra,* the Court's full discussion of the facts in its opinion indicates the significant differences between that case and this:

"The land and building were publicly owned. As an entity, the building was dedicated to 'public uses' in performance of the Authority's 'essential governmental functions.' [Citation omitted.] The costs of land acquisition, construction, and maintenance are defrayed entirely from donations by the City of Wilmington, from loans and revenue bonds and from the proceeds of rentals and parking services out of which the loans and bonds were payable. Assuming that the distinction would be significant, [citation omitted] the commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit. Upkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds. It cannot be doubted that the peculiar relationship of the restaurant to the parking facility in which it is located confers on each an incidental variety of mutual benefits. Guests of the restaurant are afforded a convenient place to park their automobiles, even if they cannot enter the restaurant directly from the parking area. Similarly, its convenience for diners may well provide additional demand for the Authority's parking facilities. Should any improvements effected in the leasehold by Eagle become part of the realty, there is no possibility of increased taxes being passed on to it since the fee is held by a tax-exempt government agency. Neither can it be ignored, especially in view of Eagle's affirmative allegation that for it to serve Negroes would injure its business, that

profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." 365 U. S., at 723–724.

Here there is nothing approaching the symbiotic relationship between lessor and lessee that was present in *Burton,* where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary public purpose of furnishing parking space by advantageously leasing portions of the building constructed for that purpose to commercial lessees such as the owner of the Eagle Restaurant. Unlike *Burton,* the Moose Lodge building is located on land owned by it, not by any public authority. Far from apparently holding itself out as a place of public accommodation, Moose Lodge quite ostentatiously proclaims the fact that it is not open to the public at large.[2] Nor is it located and operated in such surroundings that although private in name, it discharges a function or performs a service that would otherwise in all likelihood be performed by the State. In short, while Eagle was a public restaurant in a public building, Moose Lodge is a private social club in a private building.

With the exception hereafter noted, the Pennsylvania Liquor Control Board plays absolutely no part in establishing or enforcing the membership or guest policies of the club that it licenses to serve liquor.[3] There is

---

[2] The Pennsylvania courts have found that Local 107 is not a "place of public accommodation" within the terms of the Pennsylvania Human Relations Act, Pa. Stat. Ann., Tit. 43, § 951 *et seq.* (1964). *Pennsylvania Human Relations Comm'n v. The Loyal Order of Moose, Lodge No. 107,* Ct. Common Pleas, Dauphin County, aff'd, 220 Pa. Super. 356, 286 A. 2d 374 (1971).

[3] Unlike the situation in *Public Utilities Comm'n v. Pollak,* 343 U. S. 451 (1952), where the regulatory agency had affirmatively ap-

no suggestion in this record that Pennsylvania law, either as written or as applied, discriminates against minority groups either in their right to apply for club licenses themselves or in their right to purchase and be served liquor in places of public accommodation. The only effect that the state licensing of Moose Lodge to serve liquor can be said to have on the right of any other Pennsylvanian to buy or be served liquor on premises other than those of Moose Lodge is that for some purposes club licenses are counted in the maximum number of licenses that may be issued in a given municipality. Basically each municipality has a quota of one retail license for each 1,500 inhabitants. Licenses issued to hotels, municipal golf courses, and airport restaurants are not counted in this quota, nor are club licenses until the maximum number of retail licenses is reached. Beyond that point, neither additional retail licenses nor additional club licenses may be issued so long as the number of issued and outstanding retail licenses remains at or above the statutory maximum.

The District Court was at pains to point out in its opinion what it considered to be the "pervasive" nature of the regulation of private clubs by the Pennsylvania Liquor Control Board. As that court noted, an applicant for a club license must make such physical alterations in its premises as the board may require, must file a list of the names and addresses of its members and employees, and must keep extensive financial records. The board is granted the right to inspect the licensed premises at any time when patrons, guests, or members are present.

However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster

proved the practice of the regulated entity after full investigation, the Pennsylvania Liquor Control Board has neither approved nor endorsed the racially discriminatory practices of Moose Lodge.

or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise. The limited effect of the prohibition against obtaining additional club licenses when the maximum number of retail licenses allotted to a municipality has been issued, when considered together with the availability of liquor from hotel, restaurant, and retail licensees, falls far short of conferring upon club licensees a monopoly in the dispensing of liquor in any given municipality or in the State as a whole. We therefore hold that, with the exception hereafter noted, the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make the latter "state action" within the ambit of the Equal Protection Clause of the Fourteenth Amendment.

The District Court found that the regulations of the Liquor Control Board adopted pursuant to statute affirmatively require that "[e]very club licensee shall adhere to all of the provisions of its Constitution and By-Laws." [4] Appellant argues that the purpose of this provision "is purely and simply and plainly the prevention of subterfuge," pointing out that the *bona fides* of a private club, as opposed to a place of public accommodation masquerading as a private club, is a matter with which the State Liquor Control Board may legitimately concern itself. Appellee concedes this to be the case, and expresses disagreement with the District Court on this point. There can be no doubt that the label "private club" can be and has been used to evade both regulations of state and local liquor authorities, and statutes requiring places of public accommodation to serve all persons without regard to race, color, religion, or na-

---

[4] Regulations of the Pennsylvania Liquor Control Board § 113.09 (June 1970 ed.).

tional origin. This Court in *Daniel* v. *Paul*, 395 U. S. 298 (1969), had occasion to address this issue in connection with the application of Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a *et seq.*

The effect of this particular regulation on Moose Lodge under the provisions of the constitution placed in the record in the court below would be to place state sanctions behind its discriminatory membership rules, but not behind its guest practices, which were not embodied in the constitution of the lodge. Had there been no change in the relevant circumstances since the making of the record in the District Court, our holding in Part I of this opinion that appellee has standing to challenge only the guest practices of Moose Lodge would have a bearing on our disposition of this issue. Appellee stated upon oral argument, though, and Moose Lodge conceded in its brief [5] that the bylaws of the Supreme Lodge have been altered since the lower court decision to make applicable to guests the same sort of racial restrictions as are presently applicable to members.[6]

Even though the Liquor Control Board regulation in question is neutral in its terms, the result of its application in a case where the constitution and bylaws of a

---

[5] Brief for Appellant 10.

[6] Section 92.1 of the General Laws of the Loyal Order of Moose presently provides in relevant part as follows:

"Sec. 92.1—*To Prevent Admission of Non Members*—There shall never at any time be admitted to any social club or home maintained or operated by any lodge, any person who is not a member of some lodge in good standing. The House Committee may grant guest privileges to persons who are eligible for membership in the fraternity consistent with governmental laws and regulations. A member shall accompany such guest and shall be responsible for the actions of said guest, and upon the member leaving, the guest must also leave. It is the duty of each member of the Order when so requested to submit for inspection his receipt for dues to any member of any House Committee or its authorized employee."

club required racial discrimination would be to invoke the sanctions of the State to enforce a concededly discriminatory private rule. State action, for purposes of the Equal Protection Clause, may emanate from rulings of administrative and regulatory agencies as well as from legislative or judicial action. *Robinson* v. *Florida,* 378 U. S. 153, 156 (1964). *Shelley* v. *Kraemer,* 334 U. S. 1 (1948), makes it clear that the application of state sanctions to enforce such a rule would violate the Fourteenth Amendment. Although the record before us is not as clear as one would like, appellant has not persuaded us that the District Court should have denied any and all relief.

Appellee was entitled to a decree enjoining the enforcement of § 113.09 of the regulations promulgated by the Pennsylvania Liquor Control Board insofar as that regulation requires compliance by Moose Lodge with provisions of its constitution and bylaws containing racially discriminatory provisions. He was entitled to no more. The judgment of the District Court is reversed, and the cause remanded with instructions to enter a decree in conformity with this opinion.

*Reversed and remanded.*

Mr. Justice Douglas, with whom Mr. Justice Marshall joins, dissenting.

My view of the First Amendment and the related guarantees of the Bill of Rights is that they create a zone of privacy which precludes government from interfering with private clubs or groups.[1] The associational

---

[1] It has been stipulated that Moose Lodge No. 107 "is, in all respects, private in nature and does not appear to have any public characteristics." App. 23. The cause below was tried solely on the theory that granting a Pennsylvania liquor license to a club assumed to be purely private was sufficient state involvement to trigger the Equal Protection Clause. There was no occasion to consider the

rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires. So the fact that the Moose Lodge allows only Caucasians to join or come as guests is constitutionally irrelevant, as is the decision of the Black Muslims to admit to their services only members of their race.

The problem is different, however, where the public domain is concerned. I have indicated in *Garner* v. *Louisiana*, 368 U. S. 157, and *Lombard* v. *Louisiana*, 373 U. S. 267, that where restaurants or other facilities serving the public are concerned and licenses are obtained from the State for operating the business, the "public" may not be defined by the proprietor to include only people of his choice; nor may a state or municipal service be granted only to some. *Evans* v. *Newton*, 382 U. S. 296, 298–299.

Those cases are not precisely apposite, however, for a private club, by definition, is not in the public domain. And the fact that a private club gets some kind of permit from the State or municipality does not make it *ipso facto* a public enterprise or undertaking, any more than the grant to a householder of a permit to operate an incinerator puts the householder in the public domain. We must, therefore, examine whether there are special circumstances involved in the Pennsylvania scheme which differentiate the liquor license possessed by Moose Lodge from the incinerator permit.

question whether, perhaps because of a role as a center of community activity, Moose Lodge No. 107 was in fact "private" for equal protection purposes. The decision today, therefore, leaves this question open. See Comment, Current Developments in State Action and Equal Protection of the Law, 4 Gonzaga L. Rev. 233, 271–286.

Pennsylvania has a state store system of alcohol distribution. Resale is permitted by hotels, restaurants, and private clubs which all must obtain licenses from the Liquor Control Board. The scheme of regulation is complete and pervasive; and the state courts have sustained many restrictions on the licensees. See *Tahiti Bar Inc. Liquor License Case*, 395 Pa. 355, 150 A. 2d 112. Once a license is issued the licensee must comply with many detailed requirements or risk suspension or revocation of the license. Among these requirements is Regulation § 113.09 which says: "Every club licensee shall adhere to all of the provisions of its Constitution and By-laws." This regulation means, as applied to Moose Lodge, that it must adhere to the racially discriminatory provision of the Constitution of its Supreme Lodge that "[t]he membership of lodges shall be composed of male persons of the Caucasian or White race above the age of twenty-one years, and not married to someone of any other than the Caucasian or White race, who are of good moral character, physically and mentally normal, who shall profess a belief in a Supreme Being."

It is argued that this regulation only aims at the prevention of subterfuge and at enforcing Pennsylvania's differentiation between places of public accommodation and bona fide private clubs. It is also argued that the regulation only gives effect to the constitutionally protected rights of privacy and of association. But I cannot so read the regulation. While those other purposes are embraced in it, so is the restrictive membership clause. And we have held that "a State is responsible for the discriminatory act of a private party when the State, by its law, has compelled the act." *Adickes* v. *Kress & Co.*, 398 U. S. 144, 170. See *Peterson* v. *City of Greenville*, 373 U. S. 244, 248. It is irrelevant whether the law is statutory, or an administrative regulation. *Robinson* v. *Florida*, 378 U. S. 153, 156. And it is irrelevant whether the discriminatory act was instigated by the regulation,

or was independent of it. *Peterson* v. *City of Green-ville, supra.* The result, as I see it, is the same as though Pennsylvania had put into its liquor licenses a provision that the license may not be used to dispense liquor to blacks, browns, yellows—or atheists or agnostics. Regulation § 113.09 is thus an invidious form of state action.

Were this regulation the only infirmity in Pennsylvania's licensing scheme, I would perhaps agree with the majority that the appropriate relief would be a decree enjoining its enforcement. But there is another flaw in the scheme not so easily cured. Liquor licenses in Pennsylvania, unlike driver's licenses, or marriage licenses, are not freely available to those who meet racially neutral qualifications. There is a complex quota system, which the majority accurately describes. *Ante,* at 176. What the majority neglects to say is that the quota for Harrisburg, where Moose Lodge No. 107 is located, has been full for many years.[2] No more club licenses may be issued in that city.

This state-enforced scarcity of licenses restricts the ability of blacks to obtain liquor, for liquor is commercially available *only* at private clubs for a significant portion of each week.[3] Access by blacks to places that

---

[2] Indeed, the quota is more than full, as a result of a grandfather clause in the law limiting licenses to one per 1,500 inhabitants. Act No. 702 of Dec. 17, 1959, § 2. There are presently 115 licenses in effect in Harrisburg, and based on 1970 census figures, the quota would be 45.

[3] Hotels and restaurants may serve liquor between 7 a. m. and 2 a. m. the next day, Monday through Saturday. On Sunday, such licenses are restricted to sales between 12 p. m. and 2 a. m., and between 1 p. m. and 10 p. m. Pennsylvania Liquor Code, § 406 (a). Thus, such licensees may serve a total of 123 hours per week. Club licensees, however, are permitted to sell liquor to members and guests from 7 a. m. to 3 a. m. the next day, seven days a week. *Ibid.* The total hours of sale permitted club licensees are 140, 17 more than are permitted hotels and restaurants. (There is an

serve liquor is further limited by the fact that the state quota is filled. A group desiring to form a nondiscriminatory club which would serve blacks must purchase a license held by an existing club, which can exact a monopoly price for the transfer. The availability of such a license is speculative at best, however, for, as Moose Lodge itself concedes, without a liquor license a fraternal organization would be hard pressed to survive.

Thus, the State of Pennsylvania is putting the weight of its liquor license, concededly a valued and important adjunct to a private club, behind racial discrimination.

As the first Justice Harlan, dissenting in the *Civil Rights Cases*, 109 U. S. 3, 59, said:

> "I agree that government has nothing to do with social, as distinguished from technically legal, rights of individuals. No government ever has brought, or ever can bring, its people into social intercourse against their wishes. Whether one person will permit or maintain social relations with another is a matter with which government has no concern. . . . What I affirm is that no State, nor the officers of any State, nor any corporation or individual wielding power under State authority for the public benefit or the public convenience, can, consistently . . . with the freedom established by the fundamental law . . . discriminate against freemen or citizens, in those rights, because of their race . . . ."

The regulation governing this liquor license has in it that precise infirmity.[4]

I would affirm the judgment below.

---

additional restriction on election-day sales as to which only club licensees are exempt. *Ibid.*)

[4] The majority asserts that appellee Irvis had "standing" only to challenge Moose Lodge's guest-service practices, not its membership policies, on the theory that his "injury . . . stemmed, not from the lodge's membership requirements, but from its policies with

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, dissenting.

When Moose Lodge obtained its liquor license, the State of Pennsylvania became an active participant in the operation of the Lodge bar. Liquor licensing laws

respect to the serving of guests of members." *Ante,* at 166. I submit that appellee's standing is not so confined.

A litigant has standing, for purposes of the Art. III "case" or "controversy" requirement, if he "alleges that the challenged action has caused him injury in fact, economic or otherwise." *Association of Data Processing Service Organizations* v. *Camp,* 397 U. S. 150, 152. When Moose Lodge refused service to appellee Irvis solely because of his race, it imposed upon him a special disability apart from that suffered by the population at large. If this discrimination is chargeable to the State, Irvis has standing, not only to challenge Moose Lodge's guest policies—the immediate cause of the harm—but also to challenge the state scheme which authorized these policies. For an individual "subjected by statute to special disabilities necessarily has . . . a substantial, immediate, and real interest in the validity of the statute which imposes the disability." *Evers* v. *Dwyer,* 358 U. S. 202, 204.

Moreover, once called into question, all discrimination authorized by the scheme is at issue. Just as a federal court may order an entire school desegregated upon the petition of a litigant representing only the fifth grade, so could the court below cure the invidious discrimination it found to exist in Pennsylvania's liquor licensing scheme upon the petition of a litigant injured only by one aspect of that discrimination. The root evil was that Irvis was discriminated against with the blessing of the State, not that he was discriminated against *qua* "guest" or "member."

In my view, moreover, a black Pennsylvanian suffers cognizable injury when the State supports and encourages the maintenance of a system of segregated fraternal organizations, whether or not he himself had sought membership in or had been refused service by such an organization, just as a black Pennsylvanian would suffer cognizable injury if the State were to enforce a segregated bus system, whether or not he had ever ridden or ever intended to ride on such a bus. Cf. *Evers* v. *Dwyer, supra.* American culture and history have been so plagued with racism and discrimination that it is clear beyond doubt that in such circumstances blacks suffer "injury in fact." It "is practically a brand upon them, affixed by the law,

are only incidentally revenue measures; they are primarily pervasive regulatory schemes under which the State dictates and continually supervises virtually every detail of the operation of the licensee's business. Very few, if any, other licensed businesses experience such complete state involvement. Yet the Court holds that such involvement. does not constitute "state action" making the Lodge's refusal to serve a guest liquor solely because of his race a violation of the Fourteenth Amendment. The vital flaw in the Court's reasoning is its complete disregard of the fundamental value underlying the "state action" concept. That value is discussed in my separate opinion in *Adickes* v. *Kress & Co.*, 398 U. S. 144, 190–191 (1970):

> "The state-action doctrine reflects the profound judgment that denials of equal treatment, and particularly denials on account of race or color, are singularly grave when government has or shares responsibility for them. Government is the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct. Therefore something is uniquely amiss in a society where the government, the authoritative oracle of community values, involves itself in racial discrimination. Accordingly, . . . the

an assertion of their inferiority, and a stimulant to . . . race prejudice . . . ." *Strauder* v. *West Virginia*, 100 U. S. 303, 308. Their stake is analogous to the "spiritual stake" in First Amendment values which we have held may give standing to raise claims under the Establishment Clause and Free Exercise Clause. See *Flast* v. *Cohen*, 392 U. S. 83.

Thus, whether state action be found in Regulation § 113.09, in Pennsylvania's creation of a monopoly which operates to restrict access to places in which blacks may be served liquor, or both, appellee Irvis has standing to challenge all aspects of the discriminatory scheme.

186

cases that have come before us [in which] this Court has condemned significant state involvement in racial discrimination, however subtle and indirect it may have been and whatever form it may have taken[,] . . . represent vigilant fidelity to the constitutional principle that no State shall in any significant way lend its authority to the sordid business of racial discrimination."

Plainly, the State of Pennsylvania's liquor regulations intertwine the State with the operation of the Lodge bar in a "significant way [and] lend [the State's] authority to the sordid business of racial discrimination." The opinion of the late Circuit Judge Freedman, for the three-judge District Court, most persuasively demonstrates the "state action" present in this case:

"We believe the decisive factor is the uniqueness and the all-pervasiveness of the regulation by the Commonwealth of Pennsylvania of the dispensing of liquor under licenses granted by the state. The regulation inherent in the grant of a state liquor license is so different in nature and extent from the ordinary licenses issued by the state that it is different in quality.

"It had always been held in Pennsylvania, even prior to the Eighteenth Amendment, that the exercise of the power to grant licenses for the sale of intoxicating liquor was an exercise of the highest governmental power, one in which the state had the fullest freedom inhering in the police power of the sovereign. With the Eighteenth Amendment which went into effect in 1919 the right to deal in intoxicating liquor was extinguished. The era of Prohibition ended with the adoption in 1933 of the Twenty-first Amendment, which has left to each state the absolute power to prohibit the sale,

possession or use of intoxicating liquor, and in general to deal otherwise with it as it sees fit.

"Pennsylvania has exercised this power with the fullest measure of state authority. Under the Pennsylvania plan the state monopolizes the sale of liquor through its so-called state stores, operated by the state. Resale of liquor is permitted by hotels, restaurants and private clubs, which must obtain licenses from the Liquor Control Board, authorizing them 'to purchase liquor from a Pennsylvania Liquor Store [at a discount] and keep on the premises such liquor and, subject to the provisions of this Act and the regulations made thereunder to sell the same and also malt or brewed beverages to guests, patrons or members for consumption on the hotel, restaurant or club premises.'

"The issuance or refusal of a license to a club is in the discretion of the Liquor Control Board. In order to secure one of the limited number of licenses which are available in each municipality an applicant must comply with extensive requirements, which in general are applicable to commercial and club licenses equally. The applicant must make such physical alterations in his premises as the Board may require and, if a club, must file a list of the names and addresses of its members and employees, together with such other information as the Board may require. He must conform his overall financial arrangements to the statute's exacting requirements and keep extensive records. He may not permit 'persons of ill repute' to frequent his premises nor allow thereon at any time any 'lewd, immoral or improper entertainment.' He must grant the Board and its agents the right to inspect the licensed premises at any time when patrons, guests or members are present. It is only on compliance

with these and numerous other requirements and if the Board is satisfied that the applicant is 'a person of good repute' and that the license will not be 'detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood,' that the license may issue.

"Once a license has been issued the licensee must comply with many detailed requirements or risk its suspension or revocation. He must in any event have it renewed periodically. Liquor licenses have been employed in Pennsylvania to regulate a wide variety of moral conduct, such as the presence and activities of homosexuals, performance by a topless dancer, lewd dancing, swearing, being noisy or disorderly. So broad is the state's power that the courts of Pennsylvania have upheld its restriction of freedom of expression of a licensee on the ground that in doing so it merely exercises its plenary power to attach conditions to the privilege of dispensing liquor which a licensee holds at the sufferance of the state.

"These are but some of the many reported illustrations of the use which the state has made of its unrestricted power to regulate and even to deny the right to sell, transport or possess intoxicating liquor. It would be difficult to find a more pervasive interaction of state authority with personal conduct. The holder of a liquor license from the Commonwealth of Pennsylvania therefore is not like other licensees who conduct their enterprises at arms-length from the state, even though they may have been required to comply with certain conditions, such as zoning or building requirements, in order to obtain or continue to enjoy the license which authorizes them to engage in their business. The state's concern in such cases is minimal and

once the conditions it has exacted are met the customary operations of the enterprise are free from further encroachment. Here by contrast beyond the act of licensing is the continuing and pervasive regulation of the licensees by the state to an unparalleled extent. The unique power which the state enjoys in this area, which has put it in the business of operating state liquor stores and in the role of licensing clubs, has been exercised in a manner which reaches intimately and deeply into the operation of the licensees.

"In addition to this, the regulations of the Liquor Control Board adopted pursuant to the statute affirmatively require that 'every club licensee shall adhere to all the provisions of its constitution and by-laws.' As applied to the present case this regulation requires the local Lodge to adhere to the constitution of the Supreme Lodge and thus to exclude non-Caucasians from membership in its licensed club. The state therefore has been far from neutral. It has declared that the local Lodge must adhere to the discriminatory provision under penalty of loss of its license. It would be difficult in any event to consider the state neutral in an area which is so permeated with state regulation and control, but any vestige of neutrality disappears when the state's regulation specifically exacts compliance by the licensee with an approved provision for discrimination, especially where the exaction holds the threat of loss of the license.

"However it may deal with its licensees in exercising its great and untrammeled power over liquor traffic, the state may not discriminate against others or disregard the operation of the Equal Protection Clause of the Fourteenth Amendment as it affects personal rights. Here the state has used its great

power to license the liquor traffic in a manner which has no relation to the traffic in liquor itself but instead permits it to be exploited in the pursuit of a discriminatory practice." 318 F. Supp. 1246, 1248–1250 (MD Pa. 1970).

This is thus a case requiring application of the principle that until today has governed our determinations of the existence of "state action": "Our prior decisions leave no doubt that the mere existence of efforts by the State, through legislation or otherwise, to authorize, encourage, or otherwise support racial discrimination in a particular facet of life constitutes illegal state involvement in those pertinent private acts of discrimination that subsequently occur." *Adickes* v. *Kress & Co.,* 398 U. S., at 202 (separate opinion of BRENNAN, J.). See, *e. g., Peterson* v. *City of Greenville,* 373 U. S. 244 (1963); *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961); *Evans* v. *Newton,* 382 U. S. 296 (1966); *Hunter* v. *Erickson,* 393 U. S. 385 (1969); *Lombard* v. *Louisiana,* 373 U. S. 267 (1963); *Reitman* v. *Mulkey,* 387 U. S. 369 (1967); *Robinson* v. *Florida,* 378 U. S. 153 (1964); *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151 (1914).

I therefore dissent and would affirm the final decree entered by the District Court.