Thomas P. PERKINS, Jr., Plaintiff,

v.

NEW ORLEANS ATHLETIC CLUB, Defendant.

Civ. A. No. 75–2325.

United States District Court, E. D. Louisiana.

Aug. 5, 1976.

---

John P. Nelson, Jr., Nelson, Nelson & Lombard, Ltd., and Robert F. Azar, New Orleans, La., for plaintiff.

Harry P. Gamble Jr., New Orleans, La., for defendant.

ALVIN B. RUBIN, District Judge.

There remain three final issues in this case:

## I. APPLICABILITY OF SECTION 1981

The plaintiff, who is black, contends that 42 U.S.C. Section 1981, which guarantees the right of any person to make and enforce contracts on the same basis as white persons, requires the NOAC to admit him to membership and thus to contract with him. This issue was left open pending the Supreme Court's decision in *Runyon v. McCrary,* 1976, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415.

*Runyon v. McCrary* dealt with the applicability of Section 1981 to private, commercial schools. In its opinion, the court dealt with the question of admission to such schools, and said that the issues it was concerned with "do not present any question of the right of a private social organization to limit its membership on racial or any other grounds." *Runyon v. McCrary,* supra, at 167, 96 S.Ct. at 2592. It cited, with apparent approbation, the decision in *Moose Lodge No. 107 v. Irvis,* 1972, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, which was discussed at length in a prior opinion in this case.

In *Runyon* the court decided that this Section, derived from the Civil Rights Act of 1866, does not merely remove legal disabilities to contract; the statute goes further and reaches "private acts of racial discrimination;" it prohibits a private person from refusing to contract with a black person when he would willingly do so with a white. It is therefore apparent that Section 1981 reaches some non-governmental (i. e., private) conduct and requires business concerns and commercial schools to deal with a black person on the same basis offered to white persons.

In footnote 10 of its opinion, the court discussed whether the "private club or other (private) establishment" exemption in Section 201(e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(e) "operates to narrow § 1 of the Civil Rights Act of 1866." It said:

As the Court of Appeals implied, that exemption, if applicable at all, comes into play only if the establishment is "not in fact open to the public . . ." 42 U.S.C. § 2000a(e). See *McCrary v. Runyon,* 4 Cir., 515 F.2d [1082], at 1088–1089. . . .

The pattern of exclusion is thus directly analogous to that at issue is *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229 [90 S.Ct. 400, 24 L.Ed.2d 386], and *Tillman v. Wheaton-Haven Recreation Assn.,* 410 U.S. 431 [93 S.Ct. 1090, 35 L.Ed.2d 403] where the so-called private clubs were open to all objectively qualified whites—i. e., those living within a specified geographic area.

Moreover, it is doubtful that a plausible "implied repeal" argument could be made in this context in any event. Implied repeals occur if two acts are in irreconcilable conflict. *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153 [96 S.Ct. 1989, 1993, 48 L.Ed.2d 540]. Title II of the Civil Rights Act of 1964, of which the "private club" exemption is a part, does not by its terms reach private schools. Since there would appear to be no potential for overlapping application of § 1981 and Title II of the 1964 Act with respect to racial discrimination practiced by private schools, there would also appear to be no potential for conflict between the § 1981 and Title II's "private club" exemption in this context. See Note, The Desegregation of Private Schools: Is Section 1981 the Answer?, 48 N.Y.U.L.Rev. 1147, 1159 (1973).

At 172, 96 S.Ct. at 2595.

This discussion implies that the private establishment exemption remains operative. This interpretation is strengthened to some extent by the statements in Mr. Justice Powell's concurrence:

(A)s the Court of Appeals suggested, some contracts are so personal "as to have a discernible rule of exclusivity which is inoffensive to § 1981. 515 F.2d, at 1089.

In *Sullivan v. Little Hunting Park,* supra, we were faced with an association in which "(t)here was no plan or purpose of exclusiveness." Participation was "open to every white person within the geographic area, there being no selective element other than race." 396 U.S. at 236, 90 S.Ct. [400] at 404. See also *Tillman v. Wheaton Haven Recreation Assn.,* supra, at 438, 93 S.Ct., [1090] at 1094. In certain personal contractual relationships, however, such as those where the offeror selects those with whom he desires to bargain on an individualized basis, or where the contract is the foundation of a close association (such as, for example, that between an employer and a private tutor, babysitter, or housekeeper), there is reason to assume that, although the choice made by the offeror is selective, it reflects "a purpose of exclusiveness" other than the desire to bar members of the Negro race. Such a purpose, certainly in most cases, would invoke associational rights long respected.

The case presented on the record before us does not involve this type of personal contractual relationship.

At 187, 96 S.Ct. at 2602.

(I) do not suggest that a "bright line" can be drawn that easily separates the type of contract offer[ed] within the reach of § 1981 from the type without. The case before us is clearly on one side of the line, however defined, and the kindergarten and music school examples are clearly on the other side. Close questions undoubtedly will arise in the grey area that necessarily exists inbetween. But some of the applicable principles and considerations, for the most part identified by the Court's opinion, are clear: Section 1981, as interpreted by our prior decisions, does reach certain acts of racial discrimination that are "private" in the sense that they involve no state action. But choices, including those involved in entering into a contract, that are "private" in the sense that they are not part of a commercial relationship offered generally or widely, and that reflect the selectivity exercised by an individual entering into a personal relationship, certainly were never intended to be restricted by the Nineteenth

Century Civil Rights Acts. The open offer to the public generally involved in the case before us is simply not a "private" contract in this sense.

At 188, 96 S.Ct. at 2603.

■ Although Section 1981 reaches some private contracts, it does not reach *all* associational relationships. Somewhere between the open-ended invitations of a private commercial school (which 1981 does reach) and a small class "operated on the basis of personal invitations extended to a limited number of preidentified students," the line must be drawn that limits the reach of section 1981.

■ In *Runyon*, the schools whose admission policies were attacked were described as "private, commercially operated, nonsectarian schools." "(T)he schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments."

The court relied on findings below that the "schools are private only in the sense that they are managed by private persons and they are not direct recipients of public funds. *Their actual and potential constituency, however, is more public than private.*" 515 F.2d at 1089, quoted in Mr. Justice Powell's concurrence. At 188, 96 S.Ct. at 2602.

"The schools extended a public offer open, on its face, to any child meeting certain minimum qualifications who chose to accept. They advertised in the 'yellow' pages of the telephone directories and engaged extensively in general mail solicitation to attract students. The schools are operated strictly on a commercial basis, and one fairly could construe their open-end invitations as offers that matured into binding contracts when accepted by those who met the academic, financial, and other racially neutral specified conditions as to qualifications for entrance. There is no reason to assume that the schools had any special reason for exercising an option of personal choice among those who responded to their public offers."

At 188, 96 S.Ct. at 2602-2603.

The NOAC operates on a different basis than the Bobbie's Private School or Fairfax-Brewster School, which were considered in *Runyon*.

As stated in the prior opinion, the NOAC "does not advertise membership to the public; it is non-profit and it is run by the senior members; it does not fulfill a vital community role; no contention is made that it receives governmental support; it exacts substantial dues without regard to the extent of the use of its facilities; except for the public affairs it sponsors and the use of its meeting room, it generally denies use of its facilities to any but members and their guests; its membership is of moderate size; it is not connected with a larger establishment that is a public accommodation; its organizers had the intention of constituting a private club; its structure has not been altered since passage of the Civil Rights Act of 1964; it maintains membership admission procedures; and its members do have a nexus of common interest."

On these facts, *Runyon* and the privacy consideration set forth at length in the prior opinion would require the conclusion that Section 1981 does not compel the NOAC to admit Mr. Perkins to membership.

## II. MR. PERKINS' STANDING TO SUE

■ The NOAC contends that Mr. Perkins sought full membership in its organization. This has been denied him. He did not seek specifically each item of relief awarded him. It is therefore suggested that he was not "aggrieved" by the NOAC's racially discriminatory actions in each specific instance and had no standing to raise these issues. But Mr. Perkins sought an entire bundle of rights. When he was denied membership, he was denied each and every one of the rights he would have had if he had been admitted. The denial of each of those caused him injury.

In *Association of Data Processing Service Organizations v. Camp*, (1970), 397 U.S. 150,

90 S.Ct. 827, 25 L.Ed.2d 184, and its companion case, *Barlow v. Collins,* (1970), 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192, standing to sue is defined by a two part test:

(1) Whether "the challenged action has caused him (the plaintiff) injury in fact, economic or otherwise;" and

(2) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."

"The use in 42 U.S.C. § 2000e–5 of the language 'a person claiming to be aggrieved'" (in Table II), the Third Circuit said in *Hackett v. McGuire Brothers,* (3 Cir. 1971), 445 F.2d 442–446, "shows a congressional intention to define standing as broadly as is permitted by Article III of the Constitution."

This rationale was specifically approved by the *United States Supreme Court in Trafficante v. Metropolitan Life Ins. Co.,* (1971), 409 U.S. 205, 208, 93 S.Ct. 364, 34 L.Ed.2d 415. Because Mr. Perkins did not seek to rent a meeting room or attend a dance when he visited in this club does not mean that he was not aggrieved by the denial of these facilities to him. He sought to use the club, to play handball, to be a member and to have all of a member's rights. He was aggrieved by the denial of each of these.

### III.   ATTORNEY'S FEES

■ The plaintiff did not prevail in his claim under Section 1981, nor in the major part of his claims under Title II; hence it is argued that attorney's fees should not be awarded him, and indeed should be awarded the defendant. But the plaintiff did obtain some relief. Aside from the damages awarded for breach of contract (which would not justify an award of attorney's fees, but does warrant taxing costs), an injunction was granted Under Title II. 42 U.S.C. § 2000e–5(k) provides that attorney's fees may be awarded to the "prevailing party" in litigation under the Civil Rights Act of 1964. While there is little litigation concerning who is the prevailing party in Civil Rights litigation, the same term is used in determining liability for court costs.

■ The Federal Rules of Civil Procedure provide: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs . . . ." Rule 54(d). The "prevailing party" as the term is used in Rule 54 usually is the party awarded a judgment. Wright and Miller, Federal Practice and Procedure, vol. 10, § 2667. 6 J. Moore, Federal Practice 54.70(4) at 1306–1307.

"A party who has obtained some relief usually will be regarded as the prevailing party even though he has not sustained all of his claims, although in some cases of this type the court will apportion costs among the parties." Wright and Miller, Federal Practice and Procedure, vol. 10, § 2667. Thus in *K–2 Ski Co. v. Head Ski Co.,* 9th Cir. 1974, 506 F.2d 471, the court said,

(H)ead contends that since K–2 prevailed on only two or its 12 alleged trade secrets and that since considerable expense of the master was spent in establishing the contentions of both parties, the costs should be divided by the parties.

In general, a party in whose favor judgment is rendered by the district court is the prevailing party  . . . . Although a plaintiff may not sustain his entire claim, if judgment is rendered for him he is the prevailing party.

■ Because the plaintiff did not win the entire bout, or even the main event, it does not follow that he was not the "prevailing party," and should take nothing in legal fees. The burden of establishing his demands to the size of the ultimate judicial determination is not solely the plaintiff's.

■■ To prevent a plaintiff from forcing a defendant to pay costs by making an exorbitant demand, the rules provide a procedure whereby a defendant may offer what is really due, and put the burden of costs on the plaintiff. Rule 68 permits a

party against whom a demand is made to offer to let judgment go against him "for the money or property or *to the effect* specified in his offer." (Emphasis supplied.) "If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer."

There is no reason why this rule should not be extended by analogy to statutes allowing attorney's fees to the "prevailing party". Compare *Thomas v. J. C. Penney Co., Inc.,* 5th Cir. 1976, 531 F.2d 270, where, after refusing to award attorney's fees to the plaintiff because she was not the "prevailing party," the court said, *"Similarly, the award of costs to Thomas may not stand."* (Emphasis supplied.) 531 F.2d at 271. If a defendant concedes that the plaintiff is entitled to only a part, or even a bit, of the relief prayed for, he might tender costs and fees to date. See *Honea v. Crescent Ford Truck Sales,* E.D.La.1975, 394 F.Supp. 201. But the defendant may not put the whole burden of attorney's fees on the plaintiff by a goal line defense when at least part of the plaintiff's demand is meritorious.

█ "The duty to be reasonable should not be borne by the plaintiff alone." *Honea v. Crescent Ford Truck Sales,* supra, 394 F.Supp. 201, at 203. While the award of attorney's fees is discretionary with the court, "One who succeeds in obtaining an injunction under (Title II) should ordinarily recover an attorney's fee *unless special circumstances* would render such an award unjust." *Newman v. Piggie Park, Enterprises, Inc.,* 1968, 390 U.S. 400, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263.

█ Those who elect a militant defense in the face of a statute allowing attorney's fees if they are defeated must take into account the time and effort they exact from their opponents. This is not a case where the plaintiff recovered nothing, cf. *Thomas v. J. C. Penney, Co., Inc.,* 5th Cir. 1976, 531 F.2d 270, or a pittance. The plaintiff obtained substantial relief. He simply did not prevail in his primary effort. Hence it must be concluded that the plaintiff was the prevailing party within the meaning of both Rule 54 and Title II.

It would be unjust to the plaintiff to deny him all attorney's fees. The defendant never offered to meet the plaintiff part way. No single olive leaf, let alone branch, was ever offered. Defending its position as it was legally justified in doing, it was fought every foot of the way. There is no injustice in requiring the defendant to pay the legal fees incurred so far as they were requisite to the issues on which plaintiff did prevail. In defense of the claim for attorney's fees, the defendant pleads impecuniosity; if this is suggested as decisive, it is worth noting that the plaintiff is even less able financially to hire lawyers.

█ The plaintiff will be awarded attorneys' fees on the basis of the value of their services with respect to the claims that resulted in judgment in plaintiff's favor, the traditional quantum meruit. The plaintiff should not recover all attorney's fees incurred, those required to pursue unsuccessful claims or those required to pursue claims that do not carry an allowance of fees. But the plaintiff should be reimbursed for those fees reasonably required to achieve the successful result under Title II. Counsel for the plaintiff have entered time sheets and proposed dollar figures into the record, but these cover the entire case. The effort required to pursue only the "successful" portion of plaintiff's claim would itself have been substantial. Considering the importance and novelty of the issues involved, the time expended, the briefs submitted, and the other factors set forth in *Johnson v. Georgia Highway Express,* 5th Cir. 1974, 488 F.2d 714, an award of $10,000 for attorney's fees is appropriate.

Judgment will be entered accordingly.