Theodore **BARNES**, Jr., a disabled adult, by Mary Ann **BARNES**, his Guardian, Plaintiff,

v.

**MAYTAG CORPORATION, a Delaware corporation, Defendant.**

Civ. No. 91–4145.

United States District Court, S.D. Illinois.

Aug. 3, 1992.

Linda L. Austin, Brocton D. Lockwood, Marion, Ill., Prof. William A. Schroeder, Southern Illinois University, School of Law, Carbondale, Ill., for plaintiff.

Stephen J. Poor, Mark L. Keenan, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

FOREMAN, Senior District Judge:

This matter is before the Court on cross-motions for summary judgment (Document Nos. 12 and 14). The Court has jurisdiction of the case pursuant to 28 U.S.C. § 1331 (1988) because the plaintiff's complaint raises a federal question under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (1988).

## I. FACTS

At issue in this case is whether the plaintiff is entitled to benefits under an employee retirement plan provided by the defendant. The parties have submitted a stipulation and a supplemental statement of certain undisputed facts in this case (Document Nos. 9 and 11). Based upon these documents, the Court finds the following:

The plaintiff, Theodore Barnes Jr., is a mentally retarded, severely disabled adult. His parents were divorced in 1966 and the plaintiff was placed in the custody of his father, Theodore Barnes Sr., pursuant to a divorce decree entered on December 8, 1966. The order, however, provided that the plaintiff's mother, Jean Barnes, would have the right to have the plaintiff and the couple's two other children "over week ends and for a period of six (6) weeks in the summertime as may be agreed between the parties, during which time [Theodore Barnes Sr.] shall pay to [Jean Barnes] for the support of said children while in her custody as aforesaid, the sum of $30 per week."

The plaintiff remained in his father's custody and was solely dependent upon his father until the elder Barnes died on January 29, 1987, at age 56. Theodore Barnes Sr. had not remarried and his marital status was single at the time of his death. The plaintiff's mother is still living. However, the plaintiff's sister, Mary Ann Barnes, was appointed the plaintiff's legal guardian on April 22, 1987.

The plaintiff has requested payment of benefits under a retirement plan provided by the Maytag Corporation to its employees. Theodore Barnes Sr. became an employee of Maytag as a result of the merger of Magic Chef, Inc., into Maytag. At the time of his death, he had been an employee of Magic Chef/Maytag for 30 years. The plaintiff's request for benefits was reviewed by Maytag's ERISA Executive Committee and denied in a letter dated May 13, 1991. The reasons given for the denial were (1) that the retirement plan allows only surviving spouses to continue to receive benefits following the death of an employee; and (2) the 1966 Barnes divorce decree did not meet the requirements for a qualified domestic relations order and, therefore, did not qualify under the exception to ERISA's general rule prohibiting assignment or alienation of benefits. 29 U.S.C. § 1056(d).

Following the Executive Committee's decision, the plaintiff brought this action in state court on May 29, 1991. The defendant removed the case to this Court pursuant to 28 U.S.C. § 1441 (1988).

## II. ANALYSIS

A court may grant summary judgment only if the party seeking summary judgment demonstrates that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 841 F.2d 1347, 1354 (7th Cir.1988). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Cel-*

*otex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir.1988). Where the moving party fails to meet its strict burden of proof, summary judgment cannot be entered even if the opposing party fails to respond to the motion. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1222 (7th Cir.1984).

When the parties do not dispute the factual basis of a motion for summary judgment, as is the case here, the court's only inquiry is whether judgment should issue as a matter of law. The burden of proof on this matter rests with the moving party. Summary judgment is inappropriate, however, if the parties disagree about inferences reasonably to be drawn from undisputed facts. *Bowyer v. United States Dep't of Air Force*, 804 F.2d 428, 430 (7th Cir.1986).

The plaintiff's complaint seeks a declaratory judgment that the plaintiff is entitled to benefits under the defendant's employee retirement plan. Because the plaintiff's action relates to an employee benefit plan, this state law theory of recovery is preempted under section 514(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a) (1988).[1] Thus, plaintiff's complaint must be construed as a claim under ERISA's civil enforcement provision in 29 U.S.C. § 1132(a)(1)(B).[2]

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). In those cases in which the plan administrator is given discretion, the arbitrary or capricious standard is applied. *Rizzo v. Caterpillar, Inc.*, 914 F.2d 1003, 1008 (7th Cir.1990).

The defendant's retirement plan gives discretionary authority to the Executive Committee "to construe the Plan and Trust Agreement and to determine all questions arising in the administration, interpretation and operation of the Plan...." Joint Exhibit A, Art. 11, § 11.04. Thus, the Court must determine whether the committee's denial of benefits was arbitrary or capricious, which has been defined within the context of ERISA as follows:

> The arbitrary and capricious standard holds that a trustee's decision shall not be overturned on a § 1132(a)(1)(B) matter, absent special circumstances such as fraud or bad faith, if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." ... "[A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents." ... Nor will it do so where the trustee has based its decision " 'on a consideration of the relevant factors' " that encompass the " 'important aspect[s] of the problem' " before it.... If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

---

1. Section 1144(a) states that

   [e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

   29 U.S.C. § 1144(a). The Supreme Court has stated that "[a] law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). There can be no dispute that the plaintiff's declaratory judgment action "relates to" an employee benefit plan.

2. Section 1132(a)(1)(B) provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."

*Exbom v. Central States, Southeast and Southwest Areas Health & Welfare Fund,* 900 F.2d 1138, 1142–43 (7th Cir.1990) (citations omitted).

The payment of benefits upon the death of a plan participant is covered by Article 8 of the defendant's retirement plan. Section 8.01 applies to participants who, like Theodore Barnes Sr., died before reaching age 60. The section provides that

> [a]n active, inactive, or vested terminated Participant who dies (1) prior to attaining age 60 with 10 or more years of Credited Service, and (2) before benefit payments commence under this Plan shall have paid *to his Spouse (if any)* a monthly amount of Retirement Income payable in monthly installments, commencing on the last day of the month in which the Participant's death occurs and ending on the last of the month in which the spouse's death shall occur. The Spouse's income will be 50% of the monthly Retirement Income that the Participant would have received under a Joint and Survivor Annuity under Section 9.01(b) assuming that he had terminated employment on the date of his death and elected at age 60 an immediate Early Retirement benefit under Section 5.02.

Joint Exhibit A, Art. 8, § 8.01 (emphasis added). However, the plan further provides in section 8.04 that "[a]n active, inactive, terminated or retired Participant who shall die prior to satisfying the requirements of any of Sections 8.01–8.03 *or who shall die without a Spouse,* shall not be entitled to any death benefits payable on his behalf under this Plan." *Id.* § 8.04 (emphasis added).

Based upon these two provisions, the Executive Committee stated that the plan "only allows surviving spouses to continue to receive benefits ... following the death of an employee." *Joint Exhibit C.* Because the plaintiff is not, and could not be treated as, a surviving spouse of Theodore Barnes Sr., the committee concluded that no benefits could be paid to the plaintiff.

■ The plaintiff argues that the death benefits provision is unconstitutional because it arbitrarily and invidiously interferes with an individual's right to decide whether to marry or not marry and because it arbitrarily discriminates against unmarried individuals. However, as the plaintiff recognizes, the plan denies due process and violates the equal protection clause of the United States Constitution only if the plan or its enforcement constitutes state action. Private action is immune from the restrictions of the fourteenth amendment.

The plaintiff argues that the defendant's denial of benefits is state action because the retirement plan is subject to extensive and detailed regulation under ERISA. It is well established, however, that private action does not become state action merely because the private actor is subject to government regulation.

> The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.... Nor does the fact that the regulation is extensive and detailed ... do so.... [T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

*Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350–51, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972) ("The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity ... is subject to state regulation in any degree whatever.").

The plaintiff argues that the federal government has a sufficiently close nexus with the retirement plan because the government not only regulates the plan, but also insures it. As the defendant points out, however, the Pension Benefit Guaranty Corporation is funded by the pension plans themselves. 29 U.S.C. § 1306 (1988). The government merely acts as administrator of the fund. This role is more akin to

regulation than to actual involvement in everyday pension fund operations.[3]

The plaintiff next argues that judicial enforcement of the plan's provisions constitutes state action. In support of this argument, the plaintiff cites *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), in which the Supreme Court held that judicial enforcement of restrictive covenants based upon race violated the equal protection clause. The plaintiff would give *Shelley* a broad interpretation, finding that state action exists whenever a private person's decision to discriminate (or an agreement between two people to discriminate) is enforced or left undisturbed by the judicial system. The Supreme Court, however, has given *Shelley* a much narrower interpretation. *See Edmonson v. Leesville Concrete Co.*, —— U.S. ——, ——, 111 S.Ct. 2077, 2083, 114 L.Ed.2d 660 (1991) (citing *Shelley* to suggest that a particular act or course of conduct may be considered state action where "the injury caused is aggravated in a unique way by the incidents of governmental authority...").

> In [*Shelley*], state courts were called upon to enforce racially restrictive covenants against sellers of real property who did not wish to discriminate. The coercive power of the State was necessary in order to enforce the private choice of those who had created the covenants: "[B]ut for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the property in question without restraint."

*Id.* —— U.S. at ——––——, 111 S.Ct. at 2090–91 (O'Connor, J., dissenting). Moreover, as Justice O'Connor points out, "[t]he state courts in *Shelley* used coercive force to impose conformance on parties who did

not wish to discriminate." *Id.* —— U.S. at ——, 111 S.Ct. at 2091. Justice O'Connor, therefore, distinguished *Shelley* from cases in which the court merely enforces a private party's decision. In this latter situation, "the discrimination is wholly a matter of private choice.... Judicial acquiescence does not convert private choice into that of the state." *Id.*

The Supreme Court has recognized that private conduct may be actionable under a "joint action" or "joint participation" doctrine—i.e., where private parties have participated in a joint action with a state actor. Thus, the Court has held that state action exists where a private party, in exercising an *ex parte* right or privilege under state law, invokes the significant aid of state officials. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482 (1982). Here again, however, this doctrine has been construed narrowly. The Supreme Court first applied the doctrine in prejudgment attachment cases, where state law allowed state officials to attach property on the *ex parte* application of one party to a private dispute. *See, e.g., Lugar*, 457 U.S. at 922, 102 S.Ct. 2744; *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978). More recently, the Court applied the doctrine to the use of peremptory challenges to strike prospective jurors in civil suits. *Edmonson*, —— U.S. at ——, 111 S.Ct. at 2077. The basic theory in both situations is the same: the state has given a private party the power to do something—e.g., the power to attach property or to challenge prospective jurors— and the private party then invokes the assistance of state officials to enforce that act. Thus, the state has, in essence, cloaked the private party with state power.

---

**3.** The agency would, of course, have significant involvement in pension plans that require assistance from the fund. Thus, actions taken by the agency or under its direction would constitute state action. That is not the situation in the case at bar. The retirement plan's denial of benefits had no connection whatsoever to the Pension Fund Guaranty Corporation. The determination was based solely upon the provisions of the plan itself, which are neither required nor prohibited by the government.

Thus, it cannot be said that the government was significantly involved in the conduct of which the plaintiff complains. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 1973–74, 32 L.Ed.2d 627 (1972) ("However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State a partner or even a joint venturer in the club's enterprise.").

A very different situation arises, however, when a private citizen merely files a complaint with law enforcement officers or a civil suit in state courts. "Mere use of the courts by a private party, without more, does not constitute governmental action for purposes of § 1983 or *Bivens.*" *Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262 (7th Cir.1984). In these situations, the state officers are not joint participants with the litigant or complainant; rather, they play an impartial role in resolving the dispute between litigants. In doing so, the state officer exercises independent judgment—e.g., a court decides who should prevail among two litigants and a police officer decides whether or not probable cause exists to file criminal charges. In the *ex parte* context of prejudgment attachments and peremptory challenges, on the other hand, the state official automatically carries out the private party's request without independent judgment.

It is also significant to note that it is the plaintiff who filed this lawsuit and who is seeking the assistance of the government. The Executive Committee did not rely upon any governmental power nor was it subjected to governmental coercion in making its decision to deny benefits to the plaintiff. By refusing to overturn the committee's decision, the Court is merely recognizing the right of a private party to discriminate; the Court is not using its coercive powers to require such discrimination. The Court, therefore, concludes that the denial of benefits to the plaintiff does not violate the fourteenth amendment's due process and equal protection provisions.

■ The Executive Committee also considered whether the plaintiff was entitled to benefits based upon his parents' 1966 divorce decree. Section 12.01 of the plan provides that retirement income under the plan cannot be assigned, garnished, or pledged—"[e]xcept to the extent required by a 'qualified domestic relations order' (as defined in [Internal Revenue] Code Section 414(p))...." Joint Exhibit A, Art. 12, § 12.01. Section 414(p) defines a domestic relations order as "any judgment, decree or order (including approval of a property settlement agreement) which—(i) relates to the provision of child support, alimony payments, or marital .property rights to a spouse, former spouse, child, or other dependent of a participant, and (ii) is made pursuant to a State domestic relations law (including a community property law)." 26 U.S.C. § 414(p)(1)(B).[4] A "qualified domestic relations order" is a domestic relations order "(i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and (ii) with respect to which the requirements of paragraphs (2) and (3) are met." *Id.* § 414(p)(1)(A).[5]

In the letter denying benefits to the plaintiff, the Executive Committee stated that the provisions regarding qualified do-

---

**4.** Identical language is used in ERISA, 29 U.S.C. § 1056(d)(3)(B)(ii).

**5.** Similar language is used in ERISA, 29 U.S.C. § 1056(d)(3)(B)(i). Paragraph (2) provides that the domestic relations order must clearly specify certain facts.

A domestic relations order meets the requirements of this paragraph only if such order clearly specifies—

(A) the name and last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(B) the amount or percentage of the participant's benefits to be paid by the plan to each such payee, or the manner in which such amount or percentage is to be determined,

(C) the number of payments or period to which such order applies, and

(D) each plan to which such order applies. *Id.* § 414(p)(2). Paragraph (3) provides that a domestic relations order may not alter the amount or form of benefits.

A domestic relations order meets the requirements of this paragraph only if such order—

(A) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(B) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(C) does not require the payment of benefits to an alternate payee under another order previously determined to be a qualified domestic relations order.

*Id.* § 414(p)(3).

mestic relations orders did not become effective until 1985. The committee thus implies that the 1966 Barnes divorce decree is not entitled to treatment as an exception to the *general rule* prohibiting assignment of employee benefits. This suggestion is in error. The statute enacting these new provisions contained the following express provision regarding domestic relations orders that were entered prior to the effective date of the Act:

> The amendments [governing qualified domestic relations orders] shall take effect on January 1, 1985, except that in the case of a domestic relations order entered before such date, the plan administrator—
>
> (1) shall treat such order as a qualified domestic relations order if such administrator is paying benefits pursuant to such order on such date, and
>
> (2) may treat any other such order entered before such date as a qualified domestic relations order even if such order does not meet the requirements of such amendments.

Retirement Equity Act, Pub.L. No. 98–397, Title III, § 303(d), 98 Stat. 1426, 1453 (1984). Thus, the Executive Committee had the discretion to treat the 1966 Barnes divorce decree as a qualified domestic relations order, or to decline to give the decree such treatment. *Cummings v. Briggs & Stratton,* 797 F.2d 383 (7th Cir.), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 703 (1986).

The committee's failure to recognize this retroactive application of the statute is not fatal to its decision, however, because the committee's denial letter goes on to state that

> even if the retirement plan were to attempt to consider the December 8, 1966 Decree of Divorce to be a Qualified Domestic Relations Order, it could not do so for several reasons, including the following:
>
> 1. The decree does not award any funds from this, or any other retirement plan, to Theodore Barnes, Jr.
>
> 2. The plan only allows surviving spouses to continue to receive benefits (under certain benefit options selected by spouses and retirees) following the death of an employee. Theodore Barnes, Jr. is not, nor could he be, treated as a surviving spouse of Theodore Barnes under either the decree or the plan.

Joint Exhibit C.

This conclusion is supported by the evidence before the committee and a reasonable interpretation of the provisions of the retirement plan set forth above. There is no question that the Barnes divorce decree is a domestic relations order within the meaning of 26 U.S.C. § 414(p)(1)(B). However, the decree does nothing more than provide that the plaintiff's father was to pay the plaintiff's mother $30 per week for the periods in which the children were visiting her. The only reasonable interpretation of this order is that it required Theodore Barnes Sr. to make child support payments to his ex-wife while he was alive. There is nothing in the order that even remotely suggests that the ex-wife would be entitled to payments after Theodore Barnes Sr.'s death.

Even if the decree could be construed as giving the plaintiff's mother a right to receive death benefit payments as the former spouse of Theodore Barnes Sr., this right would accrue to the plaintiff's mother, not to the plaintiff himself. Moreover, the decree provides for payments to the plaintiff's mother only for those periods in which she had custody of the couple's children. The record indicates that she does not have custody of the plaintiff and there is no indication that she has custody of any of the couple's other children at this time.

Based upon this analysis, the Court concludes that the committee was within its discretion to decline to treat the decree as a qualified domestic relations order that gave the plaintiff the right to receive death benefits under the plan. The committee's determination makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached. Therefore, it is not arbitrary or capricious.

The plaintiff's final argument is that the defendant has not complied with ERISA's

procedural rules requiring the retirement plan (1) to establish "reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under qualified orders"; and (2) to segregate, while a decision is pending on the status of a domestic relations order, any benefits that would be payable to an alternate payee if the order is ultimately determined to be a qualified domestic relations order. 29 U.S.C. §§ 1056(d)(3)(G)(ii) & (d)(3)(H)(i).

As the defendant points out, this argument goes beyond the scope of the plaintiff's complaint and appears to have no relevance to the plaintiff's claim. Even assuming that the plan failed to comply with these procedural rules, the plaintiff has not shown any relationship between this allegation and his claim for relief. Specifically, the plaintiff has not demonstrated, nor can it be assumed, that the Executive Committee's decision to deny him benefits would have been different if such procedures had been in place.

### III. SUMMARY

Based upon the foregoing analysis, the Court finds that no genuine issue of fact exists in this case and that the defendant is entitled to judgment as a matter of law. The Court, therefore, GRANTS the defendant's motion for summary judgment (Document No. 12) and DENIES the plaintiff's motion for summary judgment (Document No. 14). The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.